UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MISSOURI

ST. LOUIS DIVISION

| | | |
|---|---|---|
| ROCHESTER LABORERS PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | § § § | Civil Action No. <u>10-1380</u> |
| | § | <u>CLASS ACTION</u> |
| Plaintiff, | § § | <u>DEMAND FOR JURY TRIAL</u> |
| | § | |
| vs. | § § | |
| | § | |
| MONSANTO COMPANY, HUGH M. GRANT, TERRELL K. CREWS and CARL M. CASALE, | § § § | |
| | § | |
| Defendants. | § § | |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## CLASS ACTION COMPLAINT

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Monsanto Company ("Monsanto" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Monsanto between January 7, 2009 and May 27, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

4.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

5.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of Monsanto during the Class Period and has been damaged thereby.

7.      Defendant Monsanto is a Delaware corporation which maintains its headquarters at 800 North Lindbergh Boulevard, St. Louis, MO 63167.  The common stock of Monsanto trades on the New York Stock Exchange ("NYSE") under the symbol "MON."

8.      Defendant Hugh M. Grant ("Grant") is, and at all relevant times was, Chairman, President and Chief Executive Officer of Monsanto.

9.      Defendant Terrell K. Crews ("Crews") was the Executive Vice President and Chief Financial Officer ("CFO") of Monsanto from prior to the Class Period until November 30, 2009.

10.     Defendant Carl M. Casale ("Casale") was Executive Vice President of Strategy and Operations at Monsanto from prior to the Class Period until September 1, 2009, and has been the CFO of Monsanto since September 1, 2009.

11.     Defendants Grant, Crews and Casale are collectively referred to herein as the "Individual Defendants."

12.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Monsanto, were privy to confidential and proprietary information concerning Monsanto, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Monsanto, as discussed in detail below.  Because of their positions with Monsanto,

the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

13.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Monsanto's business.

14.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

15.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NYSE and governed by the federal securities

laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Monsanto's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Monsanto's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

16. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Monsanto's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Monsanto's business, operations, risks and management and the intrinsic value of Monsanto's securities; and (ii) caused Plaintiff and members of the Class to purchase Monsanto common stock at artificially inflated prices and suffer damages when the truth was revealed.

## CLASS ACTION ALLEGATIONS

17. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Monsanto between January 7, 2009 through May 27, 2010, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

18. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Monsanto common stock was actively traded on the

NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Monsanto or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

19.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

20.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Monsanto;

(c)     whether the price of Monsanto common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

22.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Monsanto is a provider of agricultural products for farmers.  The Company's seeds, biotechnology trait products, and herbicides provide farmers with solutions to produce foods for consumers and feed for animals.  Monsanto operates in two segments: Seeds and Genomics, and Agricultural Productivity.

24.     The Agricultural Productivity segment consists of the Company's crop protection products and lawn-and-garden herbicide precuts, most notably Roundup®.  Roundup is a systemic, broad-spectrum herbicide containing the active ingredient glyphosate.  Monsanto developed and patented the glyphosate molecule in the 1970s, and marketed Roundup starting in 1973.

25.     As set forth in more detail below, Defendants knew or recklessly disregarded the fact that by early-2009, demand for the Company's Roundup product was greatly decreasing due to the influx of cheaper generic products into the market as well as other factors, leaving the Company unable to reach the growth targets that Defendants had advised the market were a near certainty just several months earlier.

26.     Through late 2009 and early 2010, the true state of the Company's business was revealed through a series of partial disclosure events, concluding with the announcement that

Monsanto was "dramatically" repositioning its Roundup business. As a result of the truth being revealed to the market through the partial disclosures, the price of Monsanto stock dropped from a Class Period intraday high of $93.35 on May 20, 2009 to close at $50.27 by the end of the Class Period – a drop of approximately *46%.* This drop removed the inflation from the price of Monsanto common stock, causing real economic loss to investors who had purchased Monsanto common stock during the Class Period.

**Defendants' Materially Class Period False**

**and Misleading Statements Issued During The Class Period**

27.     The Class Period begins on January 7, 2009. On that date, Monsanto issued a press release announcing its operating results for the period ended November 30, 2008. ***In connection with the results****, **the Company announced that it was <u>raising</u> full-year earnings-per-share (EPS) guidance from a range of $4.20 to $4.40 to a range of $4.40 to $4.50 on an ongoing basis. Monsanto also increased its fiscal year 2009 guidance for Roundup and other glyphosate based herbicides gross profit by $100 million to a range of $2.4-2.5 billion from a range of $2.3-2.4 billion.***

28.     Later that day, the Company held a conference call to discuss the January 7, 2009 earnings release. On that call, when asked whether Monsanto expected that farmers may be buying less herbicide in 2009, Crews stated the following:

> ***Well, right now we would expect our US Roundup business to still be strong and again, the growth that we're talking about for this year is still driven by our branded business.*** But if you think, looked at what we're doing, I think we're up about $300 million of GP in the first quarter, largely driven by Brazil, to get to the range that we've given, we're talking about another 2 to $300 million in the rest of the year and that's largely going to be driven by our US business and it's still again largely driven by our branded business.

29.     As a result of the Company's earnings announcement and Defendants' false and misleading statements, Credit Suisse issued an analyst report noting that Monsanto had a

"Blowout Quarter." The report went on to note that "[t]he major standout this quarter was the Roundup business which posted gross profit of $804mm, over $200mm higher than our estimate." Morgan Stanley noted that Monsanto's "results and outlook [were] well ahead of street expectations." Morgan Stanley further noted that "[w]hile the Street has been concerned about both glysophate pricing and corn seed profitability, Monsanto's results and outlook should allay these concerns."

30.     In response to this news, the price of Monsanto stock jumped **17.3%** from $73.46 to $86.16 on over three times the stock's average daily trading volume.

31.     On February 18, 2009, Casale spoke at the Morgan Stanley Global Basic Materials Conference. At the conference, Casale stated:

> ***As we look at our Roundup business, we're comfortable at both the $2.4 to $2.5 billion number this year, as well as the $1.9 billion number in 2012.*** And one of the things that's happened through this last cycle was, we've taken a tremendous amount of cost out of this business from an SG&A operating cost standpoint OpEx, but we've also taken over $1 billion of working capital out of this business as well. And as we saw the price rebound over the last few years, we didn't build that cost back into the business. ***So, we have a new, higher sustainable level that we'll be able to enjoy as we move into this environment in the future.***

32.     Following Casale's presentation, the Company's stock price rose from $77.19 on February 18, 2009 an intraday high of $80.45 on February 20, 2010, before closing at $79.68.

33.     On April 2, 2009, Monsanto issued a press release announcing its financial and operating results for the period ended February 28, 2009. ***In connection with the results, Monsanto affirmed that its full-year 2009 EPS would be in the range of $4.40 to $4.50 on an ongoing basis.*** Though lower volumes of Roundup and other glyphosate-based herbicides contributed to lower segment sales then in the prior quarter, ***Defendants attributed this to a "timing effect", as Defendants stated that customers shipments were ahead of a pre-announced price-increase in mid-February 2008.***

34.     Later that day, the Company held a conference call to discuss the April 2, 2009 earnings report. On that call, Crews stated:

> If I could summarize the last six months, I would do so this way. We have maximized the value of our seeds and trait business across the board, and it has been our call and our choice, to pursue the total value package of share trait penetration and price, rather than chase one piece at the expense of the others. ***And we have taken the same approach to Roundup, and with the strong Latin America season behind us, we are comfortable that we can preserve the total value of the US business, in the upcoming over the top spraying season.***

> If could I forecast the next six months, I would look at it this way. On a second half to second half basis, our seeds and traits gross profit will grow in the high-single digits, with corn gross profit up greater than 20%. ***Roundup gross profit will be up by low-double digits compared with gross profit in the second half last year.***

35.     On May 27, 2009, the Company announced that it expected ongoing EPS guidance of approximately $4.40 per share, the lowest point in its prior range of $4.40-$4.50 for fiscal year 2009. The Company stated that stronger-than-expected competition in the herbicide business would push fiscal-year results to the low end of its earnings forecast.  Monsanto said that its Roundup and glyphosate business would likely generate about $2 billion in gross profit for 2009, down from its previous forecast of $2.4 billion.

36.     Later that day, Grant appeared at the Sanford C. Bernstein Strategic Decisions Conference and downplayed the potential effects on the weakness in the glyphosate business on the Company's bottom line:

> And I think that's important given the down [pattern] that we announced this morning on Roundup. ***Because despite the decline of Roundup to that $2 billion dollar level in gross profit, we still see the overall opportunity in growing the business by about 20% even with that Roundup softness.***

37.     On this news, the Company's stock price fell from a price of $85.25 prior to the announcement to close at $79.88 – a drop of over ***6.2%.***  If not for Defendants' false and misleading, assurances about Monsanto's overall 2009 business, the price of Monsanto's stock would have declined even further during this time period.

38.     On June 24, 2009, Monsanto issued a press release announcing its financial and operating results for the period ended May 31, 2009.   Dropping another bombshell on the market, Monsanto said that future gross profits from its Roundup herbicide business would ***drop by half*** to about $1 billion annually.   Additionally, the press release accompanying the Company's June 24, 2009 earnings announcement noted that Monsanto was restructuring its business, creating a separate division for Roundup and other herbicides business in order to "enable the company to better align spending and working capital needs."   The Company announced that these and other actions would require a one-time restructuring charge estimated at approximately $350 million to $400 million, or $0.41 to $0.47 per share to the company's fourth-quarter EPS in fiscal year 2009.

39.     Later that day on the Company's earnings conference call, Grant again downplayed the effect that the weakening Roundup business would have on the future business prospects of the Company:

> On the other side of the coin, Roundup by then will be less than 15% of the Company's total gross profit generation. ***So even as we reset the financial bar for Roundup, we remain committed to doubling gross profit for the entire company from the 2007 base of $4.2 billion to roughly $8.6 billion to $8.8 billion in 2012, as shown on slide 7.***
>
> To be fair, when we thought Roundup would level out at $1.9 billion in gross profit, we said then that we could more than double. ***But even with a lower benchmark for Roundup, the seeds and traits business is expected to grow at more than 2.5 times its 2007 base and allow us to cross this doubling milestone for the entire corporation.***
>
> ***While it is sometimes easy to miss in the Roundup fray, 2009 will be the year that the seeds and traits business alone will deliver more gross profit than all of Monsanto did in 2007. It's a remarkable achievement in just two very short years.***

40.     On this news, the Company's stock price fell from a price of $79.30 prior to the announcement to close at $76.16.   Thereafter, the stock continued its downward spiral, falling to a low of $70.08 on July 10, 2009.   If not for Defendants' false and misleading assurances about

Monsanto's business prospects, the price of Monsanto's stock would have declined even further during this time period.

41.     On September 10, 2009, Monsanto issued a press release updating its guidance for fiscal year 2009. *The Company reaffirmed full-year 2009 ongoing EPS at the low end of its previously-announced range of $4.40 to $4.50. The Company announced that gross profit for Agricultural Productivity segment was expected to be a lower than anticipated $650 million to $750 million in 2010, though Monsanto said that this would be offset by an expected slightly higher seeds and genomics gross profit, incremental selling, general and administrative savings, and a lower tax rate.* On this news, the Company's stock price fell from a price of $83.48 prior to the announcement to close at $79.30 on extremely heavy volume – a drop of *5.0%.*

42.     On January 6, 2010, Monsanto issued a press release announcing its financial and operating results for the period ended November 30, 2009. In the press release, *the Company reiterated its fiscal year 2010 EPS outlook, affirming that it expected ongoing EPS in the range of $3.10-$3.30 with EPS on an as-reported basis in the range of $2.85-$3.11. The Company's full year guidance for the Agricultural Productivity segment was unchanged, with gross profit expectations of $650-750 million expected for 2010.* On this news, the Company's stock price rose from a price of $85.27 prior to the announcement to close at $86.27 on nearly triple the stock's average daily volume.

43.     On April 7, 2010, Monsanto issued a press release announcing its financial and operating results for the period ended February 28, 2010. *The Company confirmed full-year 2010 ongoing EPS guidance in the low end of the range of $3.10 to $3.30, with full-year 2010 EPS guidance on an as-reported basis in low end of the range of $2.85 to $3.11. The Company said it saw gross profit for the segment at plus-or-minus $600 million for the year.*

The Company also for the first time acknowledged that its goal of doubling 2007 gross profit by 2012 was unlikely.  On this news, the Company's stock price fell from a price of $69.80 prior to the announcement to close at $68.09 on extremely heavy volume.

44.     On May 5, 2010, Casale attended the UBS Global Agricultural Chemicals & Seed/Biotech Conference, *where he revealed that the Company now expected the steady-state gross profit contribution for Roundup in 2011 and going forward to be in the range of $250 million to $300 million a year.*  On this news, the Company's stock price fell from a price of $60.98 prior to the announcement to close at $58.87 on heavy volume.

45.     Then, on May 27, 2010, the Company shocked the market by announcing that it was "dramatically" repositioning its Roundup business, lowering its full-year 2010 guidance to $2.40 to $2.60 a share from $3.10 to $3.30 a share, and lowering its free cash flow guidance. The Company also announced that its guidance for Roundup and other glysophate-based products was now $50 to 200 million, down from $600 million on April 7, 2010.

46.     On that same day, Canaccord Genuity issued an earnings report indicating, in pertinent part, that "[a]lthough the new structural change has become evident in the marketplace, we are still surprised at how management expected US$600 million in the Roundup and other glyphosate business on April 7th, and less than two months later, that number is chopped to a range of US$50-200 million. The continuous string of disappointments with this stock over the past 11 months has left investors with a lack of confidence in the near-term outlook for this firm."

47.     On this news, the Company's stock price fell from a price of $52.66 prior to the announcement to close at $50.27 on extremely heavy volume – a drop of over *4.5%.*

48.     The statements referenced above in ¶¶27-29, 3, 33-36, 38-39, 41-46 were each materially false and misleading when made because they misrepresented and failed to disclose the following facts which were known by or recklessly disregarded by Defendants:

(a)     that  demand for the Company's herbicide products were substantially declining as competition from Chinese producers of generic glyphosate products was causing a collapse in the prices of glyphosate products;

(b)     that the Company would be unable to maintain herbicide prices as Defendants knew that they had to cut prices significantly to be able to compete with the avalanche of generic herbicide products that were entering the market; and

(c)     as a result of the foregoing, Defendants' positive statements about the Company, its earnings, prospects and financial condition were lacking in a reasonable basis and materially misleading.

### Additional Scienter Allegations

49.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Monsanto, their control over, and/or receipt and/or modification of Monsanto's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Monsanto, participated in the fraudulent scheme alleged herein.

50.     During the Class Period, the artificially inflated price of Monsanto stock directly benefitted the Individual Defendants and insiders, who sold 410,455 shares of stock and received proceeds of $32,065,078, as set forth below:

Hugh N. Grant:

| Date | Shares Sold | Price Per Unit | Proceeds |
|------|-------------|----------------|----------|
| 2/17/2009 | 101,674 | $76.39 | $7,766,877 |
| 2/17/2009 | 39,726 | $77.04 | $3,060,491 |
| 2/17/2009 | 8,600 | $75.88 | $652,568 |
| **TOTAL** | **150,000** | | **$11,479,936** |

Scarlett L. Foster:

| Date | Shares Sold | Price Per Unit | Proceeds |
|------|-------------|----------------|----------|
| 6/29/2009 | 7,490 | $76.52 | $573,135 |
| 6/30/2009 | 6,000 | $74.66 | $447,960 |
| **TOTAL** | **13,490** | | **$1,021,095** |

Robert T. Fraley:

| Date | Shares Sold | Price Per Unit | Proceeds |
|------|-------------|----------------|----------|
| 5/4/2009 | 6,000 | $89.00 | $534,000 |
| 11/20/2009 | 55,110 | $79.31 | $4,370,774 |
| 1/5/2010 | 10,000 | $85.00 | $850,000 |
| 1/11/2010 | 10,000 | $87.00 | $870,000 |
| **TOTAL** | **81,110** | | **$6,624,774** |

Gwendolyn S. King:

| Date | Shares Sold | Price Per Unit | Proceeds |
|------|-------------|----------------|----------|
| 10/15/2009 | 16,400 | $78.37 | $1,285,268 |
| 10/15/2009 | 3,600 | $78.35 | $282,060 |
| **TOTAL** | **20,000** | | **$1,567,328** |

Mark J. Leidy:

| Date | Shares Sold | Price Per Unit | Proceeds |
|------|-------------|----------------|----------|
| 6/29/2009 | 14,980 | $76.19 | $1,141,326 |
| **TOTAL** | **14,980** | | **$1,141,326** |

Consuelo E. Madere:

| Date | Shares Sold | Price Per Unit | Proceeds |
|------|-------------|----------------|----------|
| 1/19/2010 | 2,645 | $81.58 | $215,779 |
| 1/19/2010 | 1,414 | $81.53 | $115,283 |
| **TOTAL** | **4,059** | | **$331,062** |

Steven C. Mizell:

| Date | Shares Sold | Price Per Unit | Proceeds |
|------|-------------|----------------|----------|
| 1/16/2009 | 26,370 | $79.52 | $2,096,942 |
| 11/16/2009 | 11,300 | $75.00 | $847,500 |
| 1/20/2010 | 2,950 | $82.00 | $241,900 |
| **TOTAL** | **40,620** | | **$3,186,342** |

Kerry J. Preete:

| Date | Shares Sold | Price Per Unit | Proceeds |
|------|-------------|----------------|----------|
| 1/16/2009 | 6,400 | $79.88 | $511,232 |
| 10/16/2009 | 30,774 | $77.66 | $2,389,909 |
| **TOTAL** | **37,174** | | **$2,901,141** |

Nicole M. Ringenberg:

| Date | Shares Sold | Price Per Unit | Proceeds |
|------|-------------|----------------|----------|
| 10/15/2009 | 17,000 | $78.12 | $1,328,040 |
| **TOTAL** | **17,000** | | **$1,328,040** |

Gerald A. Steiner:

| Date | Shares Sold | Price Per Unit | Proceeds |
|------|-------------|----------------|----------|
| 10/13/2009 | 19,252 | $75.83 | $1,459,879 |
| 11/23/2009 | 12,770 | $80.20 | $1,024,154 |
| **TOTAL** | **32,022** | | **$2,484,033** |

**Loss Causation/Economic Loss**

51.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Monsanto common stock and operated as a fraud or deceit on Class Period purchasers of Monsanto common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Monsanto common stock fell precipitously as the prior artificial inflation came out.  As a result of their purchases of Monsanto common stock during the Class Period and the decline in the stock's value when the truth was revealed, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

52.     By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Monsanto's business and prospects.  Defendants' false and misleading statements had the intended effect and caused Monsanto common stock to trade at artificially inflated levels throughout the Class Period.

53.     As a direct result of Defendants' disclosure on April 29, 2010, the price of Monsanto common stock fell precipitously.  This drop removed the inflation from the price of Monsanto common stock, causing real economic loss to investors who had purchased Monsanto common stock during the Class Period.

54.     The decline in Monsanto stock was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price decline in Monsanto common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants'

fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Monsanto common stock and the subsequent significant decline in the value of Monsanto common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

55.     The market for Monsanto common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Monsanto common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Monsanto common stock relying upon the integrity of the market price of Monsanto common stock and market information relating to Monsanto, and have been damaged thereby.

56.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Monsanto common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

57.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Monsanto's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Monsanto and its business, prospects and operations, thus causing the Company's

common stock to be overvalued and artificially inflated at all relevant times.  Defendants'
materially false and misleading statements during the Class Period resulted in Plaintiff and other
members of the Class purchasing the Company's common stock at artificially inflated prices,
thus causing the damages complained of herein.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

58.    At all relevant times, the market for Monsanto common stock was an efficient
market for the following reasons, among others:

(a)    Monsanto common stock met the requirements for listing, and was listed
and actively traded on the NYSE, a highly efficient and automated market;

(b)    as a regulated issuer, Monsanto filed periodic public reports with the SEC
and the NYSE;

(c)    Monsanto regularly communicated with public investors via established
market communication mechanisms, including regular disseminations of press releases on the
national circuits of major newswire services and other wide-ranging public disclosures, such as
communications with the financial press and other similar reporting services; and

(d)    Monsanto was followed by several securities analysts employed by major
brokerage firms who wrote reports which were distributed to the sales force and certain
customers of their respective brokerage firms.  Each of these reports was publicly available and
entered the public marketplace.

59.    As a result of the foregoing, the market for Monsanto common stock promptly
digested current information regarding Monsanto from all publicly available sources and
reflected such information in the prices of the stock.  Under these circumstances, all purchasers
of Monsanto common stock during the Class Period suffered similar injury through their

purchase of Monsanto common stock at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

60.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Monsanto who knew that those statements were false when made.

**COUNT I**

**Violation of Section 10(b) of
the Exchange Act and Rule 10b-5
Promulgated Thereunder Against All Defendants**

61.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

64.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Monsanto common stock.  Plaintiff and the Class would not have purchased Monsanto common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

65.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Monsanto common stock when the truth was revealed at the close of the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

66.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

67.     The Individual Defendants acted as controlling persons of Monsanto within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Monsanto, and their ownership of Monsanto stock, the Individual Defendants had the power and authority to cause Monsanto to engage in the wrongful conduct

complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

68.     Plaintiff hereby demands a trial by jury.

DATED:  July 29, 2010                SHAMBERG, JOHNSON & BERGMAN, CHTD.
LYNN R. JOHNSON
Missouri Bar No. 41395
JOHN M. PARISI
Missouri Bar No. 36422
DOUGLAS R. BRADLEY
Missouri Bar No. 58754


*s/ John M. Parisi*
JOHN M. PARISI

2600 Grand Boulevard
Kansas City, MO 64108-4627
Telephone: 816/474-0004
816/474-0003 (fax)

ROBBINS GELLER RUDMAN & DOWD LLP
DAVID J. GEORGE
STUART A. DAVIDSON
JAMES L. DAVIDSON
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)

ROBBINS GELLER RUDMAN & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

Attorneys for Plaintiff