UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ROCHESTER LABORERS PENSION FUND, individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 4:10CV1380 CDP |
| MONSANTO COMPANY, et al., | ) ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This lawsuit brings class-wide securities claims against Monsanto and several of its senior managers on behalf of persons who purchased or acquired the common stock and debt securities of Monsanto Company between January 7, 2009 and May 27, 2010.  Lead plaintiff Arkansas Teacher Retirement System[1] claims that defendants violated §§10(b) and 20(a) of the Securities Exchange Act of 1934[2] and Rule 10b-5[3] by knowingly or recklessly making false and misleading statements about Monsanto's glyphosate/Roundup business, its newest seeds and traits products, and its earning projections for fiscal years 2009 through 2012.

---

[1]Plaintiff is a state employee pension fund.

[2]15 U.S.C. §§ 78j(b) and 78t(a).

[3]17 C.F.R. § 240.10b-5.

Defendants move to dismiss the second amended complaint[4] on the ground that the

challenged statements are either not actionable or are protected by the safe harbor

provision of the Private Securities Litigation Reform Act,[5] which governs this case.

Defendants also contend that plaintiff has failed to meet the heightened pleading

standard required by the PSLRA.  After thorough review of the massive record in

this case, which includes plaintiff's pleadings (the operative complaint alone stands

at 89 pages and 315 paragraphs), the parties' briefs (the current versions total 162

pages), and more than 65 supporting exhibits, I find that dismissal is required as

plaintiff cannot state a claim for securities fraud against defendants.

----

[4]Plaintiff was first  granted leave to amend its complaint in January of 2011.  I granted plaintiff leave to amend a second time in January of 2012.  Now, in opposition to dismissal, plaintiff asks for leave to amend yet again if I find that it has failed to state a claim against defendants.  I will deny this request.  Plaintiff has already been granted leave to amend its complaint twice (once while defendants' motion to dismiss was pending), and it makes absolutely no showing that it could cure the pleading deficiencies with a third amended complaint.  Indeed, plaintiff's request appears in a footnote and is not even accompanied by a proposed third amended complaint.  This case is already two years old and has not progressed beyond the pleading stage.  If I allowed plaintiff to perpetually revive this suit by filing amended complaints whenever faced with dismissal, defendants would be unduly prejudiced and the interests of justice (as well as one of the underlying purposes of the PSLRA) would be thwarted.  Leave to amend will be denied.  See Minneapolis Firefighters' Relief Assoc.v. MEMC Electronic Materials, Inc., 641 F.3d 1023, 1030 (8th Cir. 2011) ("Although ordinarily leave to amend should be freely granted, placing a footnote in a resistance to a motion to dismiss requesting leave to amend in the event of dismissal is insufficient.") (internal citations omitted).

[5]15 U.S.C. § 78u-4.

# Background

Monsanto makes agricultural products for farmers.[6]  The individual defendants named in this case are present and former officers of Monsanto.[7]  This case involves Monsanto's Roundup herbicide and other glyphosate-based products (called Agricultural Productivity), as well as seeds and traits for corn, soybeans, and other plants (called Seeds and Genomics).

From 2003 to 2007, the Seeds and Genomics business grew faster than Agricultural Productivity.  For the fiscal year ended August 31, 2007, Monsanto had $3 billion gross profit from Seeds and Genomics and $1.2 billion from Agricultural Productivity, $854 million of which was from the sale of Roundup/glyphosate.

In November 2007, Monsanto announced a five-year plan to double gross profit by fiscal year 2012.  It predicted this growth would come principally from Seeds and Genomics, which it forecasted to grow between $6.5 and $7 billion in 2012.  Gross profit from Roundup/glyphosate was predicted to grow to $1.2

---

[6]  Monsanto sells its products to farmers through third-party retailers.

[7]Defendant Hugh Grant is Chairman, President and Chief Executive Officer of Monsanto. Defendant Terrell Crews was the Executive Vice President and Chief Financial Officer of Monsanto until he retired on August 31, 2009.  Defendant Carl Casale was Executive Vice President of Strategy and Operations at Monsanto until September 1, 2009, and he served as Chief Financial Officer thereafter.  Defendant Brett Begemann was Executive Vice President, Seeds and Traits, during the relevant time period.

- 3 -

billion.  Monsanto ultimately did not meet this goal, primarily because of competition from Chinese and other generic glyphosate competitors.  Monsanto repeatedly lowered its Roundup/glyphosate gross-profit forecasts, and by May of 2010, Monsanto expected the Roundup/glyphosate business to generate $250-300 million per year on an ongoing basis.

In fiscal year 2008, however, Monsanto reported gross profits of $6.177 billion, which represented a 46% increase over 2007.  Roundup/glyphosate had a 131% increase ($1.976 billion gross profit), while Seeds and Genomics grew 28% to $3.857 billion, the fifth year of 20%-plus growth for this area.

In October 2008, Monsanto predicted gross profits for fiscal year 2009 of $4.5 to $4.6 billion for Seeds and Genomics and $2.3 to $2.4 billion of Roundup/glyphosate.  Defendant Terry Crews, then Monsanto's Chief Financial Officer, stated on an October 8, 2008 earnings call that Monsanto anticipated a "tough competitive environment" for Roundup/glyphosate as Chinese manufacturers, the principal competitors in this market, would supply increased amounts of generic product at a lower price.  But Monsanto believed demand for Roundup would "remain strong" and that the business's profitability would increase in fiscal year 2009 because the Chinese cost of production was roughly one-third higher than Monsanto's.

Plaintiff claims that by the fiscal year ended August 31, 2008, defendants already knew or should have known that market conditions for Roundup/glyphosate had dramatically changed and the business would generate lower profit.  Plaintiff alleges that Monsanto knew that its higher prices for Roundup were causing Monsanto's customers to purchase cheaper generic glyphosate, which was being sold by Monsanto's competitors below cost to gain market share from Monsanto's seeds and traits business.  Plaintiff alleges that the decline in Roundup/glyphosate sales was also evidenced by a buildup of excess inventory as early as November of 2008.  In further support of its pledge to double gross profits, Monsanto also announced the introduction of a new premium soybean seed, Roundup Ready 2 Yield, for the 2009 growing season, and a new SmartStax corn seed for 2010.  Plaintiff alleges that, contrary to defendants' representations, there was little demand for these new seeds because they were too expensive and failed to produce improved crop yields.  Plaintiff asserts that these material facts were known (or severely recklessly disregarded) at the beginning of the class period and not disclosed to investors, causing the price of Monsanto stock to decline from a high of over $93 per share to close at $50.27 per share at the end of the class period.

## **Legal Standards**

Before discussing the standards that govern defendants' motion to dismiss, I will briefly set out what plaintiff must plead and prove to prevail on its claims. Plaintiff brings claims under § 10(b) of the Securities Exchange Act, Rule 10b–5 implementing that section of the Act, and § 20(a) of the Act.  Section 10(b) and Rule 10b-5 prohibit fraudulent conduct in the sale and purchase of securities. Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).  "Rule 10b–5 implements [§ 10(b)] by making it unlawful to, among other things, 'make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.' " Minneapolis Firefighters' Relief Ass'n v. MEMC Electronic Materials, Inc., 641 F.3d 1023, 1028 (8th Cir. 2011) (quoting Matrixx Initiatives, Inc. v. Siracusano, 131 S.Ct. 1309, 1317 (2011)).  As the Eighth Circuit Court of Appeals explained:

> To prevail, a § 10(b)/Rule 10b–5 claimant ordinarily must show (1) a
> material misrepresentation or omission by the defendant; (2) scienter;
> (3) a connection between the misrepresentation or omission and the
> purchase or sale of a security; (4) reliance upon the misrepresentation

or omission; (5) economic loss; and (6) loss causation.

MEMC Electronic Materials, Inc., 641 F.3d at 1028 (citing Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008)).

"In order to satisfy the [PSLRA]'s falsity pleading standard, a complaint may not rest on mere allegations that fraud has occurred." In re Cerner Corp. Securities Litig., 425 F.3d 1079, 1083 (8th Cir. 2005). "Instead, the complaint must indicate why the alleged misstatements would have been false or misleading at the several points in time in which it is alleged they were made. In other words, the complaint's facts must necessarily show that the defendants' statements were misleading." Id. (internal citations and quotation marks omitted). "[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Detroit General Retirement System v. Medtronic, Inc., 621 F.3d 800, 805 (8th Cir. 2010) (internal citation and quotation marks omitted).

Scienter "can be established in three ways: (1) from facts demonstrating a mental state embracing an intent to deceive, manipulate, or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity." Id. at 808 (internal citation and quotation marks

omitted).  "The inquiry . . . is whether all of the facts alleged, taken collectively,

give rise to a strong inference of scienter, not whether any individual allegation,

scrutinized in isolation, meets that standard."  <u>Tellabs, Inc. v. Makor Issues &</u>

<u>Rights, Ltd.</u>, 551 U.S. 308, 322–23 (2007).  "[I]n determining whether the pleaded

facts give rise to a strong inference of scienter, the court must take into account

plausible opposing inferences."  <u>Id.</u> at 323.  The Supreme Court explained:

> The strength of an inference cannot be decided in a vacuum. The
> inquiry is inherently comparative: How likely is it that one
> conclusion, as compared to others, follows from the underlying facts?
> To determine whether the plaintiff has alleged facts that give rise to
> the requisite "strong inference" of scienter, a court must consider
> plausible nonculpable explanations for the defendant's conduct, as
> well as inferences favoring the plaintiff. The inference that the
> defendant acted with scienter need not be irrefutable, i.e., of the
> "smoking-gun" genre, or even the "most plausible of competing
> inferences." Recall in this regard that § 21D(b)'s pleading
> requirements are but one constraint among many the PSLRA installed
> to screen out frivolous suits, while allowing meritorious actions to
> move forward. Yet the inference of scienter must be more than merely
> "reasonable" or "permissible"—it must be cogent and compelling,
> thus strong in light of other explanations. A complaint will survive,
> we hold, only if a reasonable person would deem the inference of
> scienter cogent and at least as compelling as any opposing inference
> one could draw from the facts alleged.

<u>Id.</u> at 323–24.

Section 20(a) of the Securities Exchange Act provides for a companion

claim, establishing "liability of those who, subject to certain defenses, 'directly or

indirectly' control a primary violator of the federal securities laws."  <u>Lustgraaf v.</u>

- 8 -

Behrens, 619 F.3d 867, 873 (8th Cir. 2010) (quoting 15 U.S.C. § 78t(a)).  Section

20(a) has been interpreted "as requiring only some indirect means of discipline or

influence short of actual direction to hold a 'controlling person' liable."   Id. at 873

(internal citation and quotation marks omitted).[8]   "The plain language of the

control-person statute dictates that, absent a primary violation, a claim for

control-person liability must fail." Id. at 874.

Safe-Harbor Provision

The Exchange Act provides a safe harbor for a forward-looking statement

that is "identified as a forward-looking statement, and is accompanied by

meaningful cautionary statements identifying important factors that could cause

actual results to differ materially from those in the forward-looking statement," and

also for a forward-looking statement that is "immaterial." 15 U.S.C. §

78u–5(c)(1)(A).  15 U.S.C. § 78u–5(i)(1) defines six exclusive categories of

---

[8]To meet this standard, a plaintiff must prove:

(1) that a primary violator violated the federal securities laws; (2) that the alleged
control person actually exercised control over the general operations of the
primary violator; and (3) that the alleged control person possessed—but did not
necessarily exercise—the power to determine the specific acts or omissions upon
which the underlying violation is predicated.

Lustgraaf, 619 F.3d at 873 (internal citation and quotation marks omitted).  "Culpable
participation by the alleged control person in the primary violation is not part of a plaintiff's
prima facie case." Id. at 873-74.  If plaintiff satisfies the prima facie burden, the burden shifts to
defendants to show that they "acted in good faith and did not directly or indirectly induce the act
or acts constituting the violation or cause of action." Id. at 874 (quoting 15 U.S.C. § 78t(a)).

forward-looking statements:

> (A) a statement containing a projection of revenues, income
> (including income loss), earnings (including earnings loss) per share,
> capital expenditures, dividends, capital structure, or other financial
> items;
>
> (B) a statement of the plans and objectives of management for future
> operations, including plans or objectives relating to the products or
> services of the issuer;
>
> (C) a statement of future economic performance, including any such
> statement contained in a discussion and analysis of financial condition
> by the management or in the results of operations included pursuant to
> the rules and regulations of the Commission;
>
> (D) any statement of the assumptions underlying or relating to any
> statement described in subparagraph (A), (B), or (C).
>
> (E) any report issued by an outside reviewer retained by an issuer, to
> the extent that the report assesses a forward-looking statement made
> by the issuer; or
>
> (F) a statement containing a projection or estimate of such other items
> as may be specified by rule or regulation of the Commission.

"Courts applying this safe harbor have made clear that it only protects purely

forward-looking statements—i.e., not those that also contain representations as to

present or historical facts."  Western Washington Laborers-Employers Pension

Trust v. Panera Bread Co., 697 F. Supp. 2d 1081, 1092-93 (E.D. Mo. 2010); In re

Stone & Webster, Inc., Securities Litig., 414 F.3d 187, 213 ("The safe harbor ... is

intended to apply only to allegations of falsehood as to the forward-looking aspects

of the statement.").  To decide whether a statement is truly forward-looking, "the determinative factor is not the tense of the statement; instead, the key is whether its 'truth or falsity is discernible only after it is made.'" <u>Panera Bread</u>, 697 F. Supp. 2d at 1093 (quoting <u>Harris v. Ivax Corp.</u>, 182 F.3d 799, 805 (11th Cir. 1999)).  The applicability of this safe harbor is a question of law.  <u>See</u> 15 U.S.C. § 78u–5(e) ("On any motion to dismiss based upon [the safe harbor], the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute . . . ."); <u>Panera Bread</u>, 697 F. Supp. 2d at 1093.  "[A] forward-looking statement is protected if it is immaterial or identified as forward-looking and accompanied by meaningful cautionary language, regardless of whether the speaker knows the statement is false." <u>Id.</u> at 1089.

The safe harbor provision of the Exchange Act requires courts to assess whether cautionary language accompanying a forward-looking statement is sufficiently meaningful.  <u>See</u> 15 U.S.C. § 78u–5(c)(1)(A)(i) (safe harbor requires "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement").  The cautionary language need not be a part of the forward-looking statement so long as the statement specifies where it can be located.  <u>See</u> 15 U.S.C. §

78u–5(c)(2) (oral statements); Panera Bread, 697 F. Supp. 2d at 1089-1090 (courts

uniformly conclude that incorporation by reference for written forward-looking

statements is permissible); Yellen v. Hake, 437 F. Supp. 2d 941, 963–64 (S.D.

Iowa 2006) (same and collecting cases).

 Although courts have articulated the standard underlying the meaningfulness

requirement differently, it requires more than mere boilerplate but less than

disclosure of every potential risk.  See, e.g., Panera Bread, 697 F. Supp. 2d at

1090; Asher v. Baxter International Inc., 377 F.3d 727, 732-33 (7th Cir. 2004)

(applying § 78u–5(c)(1)(A) and identically-worded § 77z–2(c)(1)(A) safe harbors,

and concluding that the cautionary language requirement cannot require disclosure

of all potential risks); Southland Sec. Corp. v. INSpire Ins. Solutions, Inc., 365

F.3d 353, 372 (5th Cir. 2004) ("The requirement for 'meaningful' cautions calls for

'substantive' company-specific warnings based on a realistic description of the

risks applicable to the particular circumstances, not merely a boilerplate litany of

generally applicable risk factors."); Harris, 182 F.3d at 807 (to be meaningful,

cautionary statements must warn of "risks of a significance similar to that actually

realized . . . .").  "[T]o determine whether cautionary language is adequate, courts

should evaluate it in light of the allegedly undisclosed risk and determine if a

reasonable investor would have concluded that the risk that eventually materialized

- 12 -

never existed." Panera Bread, 697 F. Supp. 2d at 1090 (citing In re Sierra

Wireless, Inc. Securities Litig., 482 F. Supp. 2d 365, 380 (S.D.N.Y. 2007)).

Standards Governing Motion to Dismiss

Defendants move to dismiss these claims under Rules 12(b)(6) and 9(b) of

the Federal Rules of Civil Procedure and the PSLRA.  To survive a motion to

dismiss for failure to state a claim under Rule 12(b)(6), a complaint must contain

factual allegations sufficient "'to raise a right to relief above the speculative

level.'"  Parkhurst v. Tabor, 569 F.3d 861, 865 (8th Cir. 2009) (quoting Bell

Atlantic v. Twombly, 550 U.S. 544, 555 (2007)).  Stated another way, "the

complaint must allege only enough facts to state a claim to relief that is plausible

on its face."  B & B Hardware, Inc. v. Hargis Industries, Inc., 569 F.3d 383, 387

(8th Cir. 2009) (internal quotation marks and citation omitted).  "The plausibility

of a complaint turns on whether the facts alleged allow us to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  Lustgraaf, 619

F.3d at 873 (internal citation and quotation marks omitted).  The court must still

"accept as true the plaintiff's well pleaded allegations," Parkhurst, 569 F.3d at 865,

and "construe the complaint liberally in the light most favorable to the plaintiff."

Eckert v. Titan Tire Corp., 514 F.3d 801, 806 (8th Cir. 2008).

Although Rule 8(a) of the Federal Rules of Civil Procedure ordinarily

requires only a "short and plain statement" of the claims,  Rule 9(b) and the

PSLRA apply to plaintiff's securities fraud claims.  "Under Rule 9(b)'s heightened

pleading standard, allegations of fraud, including fraudulent concealment for

tolling purposes, [must] be pleaded with particularity."  Summerhill v. Terminix,

Inc., 637 F.3d 877, 880 (8th Cir. 2011) (internal citation and quotation marks

omitted).  "In other words, Rule 9(b) requires plaintiffs to plead the who, what,

when, where, and how: the first paragraph of any newspaper story."  Id.  As the

Eighth Circuit Court of Appeals has explained, "The PSLRA goes beyond the

ordinary pleading requirements described in Rules 8(a)(2) and 9(b) of the Federal

Rules of Civil Procedure . . . ."  In re 2007 Novastar Financial Inc., Securities

Litig., 579 F.3d 878, 882 (8th Cir. 2009).  "Claims governed by the PSLRA must

specify each statement alleged to have been misleading, the reason or reasons why

the statement is misleading (the falsity requirement), and state with particularity

facts giving rise to a strong inference that the defendant acted with the required

state of mind (the scienter requirement)."  Lustgraaf, 619 F.3d at 873 (internal

citations and quotation marks omitted); see also Medtronic, 621 F.3d at 805.

Where, as here, the "primary violation" is a § 10(b)/Rule 10b–5 securities fraud

claim, the plaintiff's § 20(a) "control person" claims against the individual

defendants, as well as the § 10(b)/Rule 10b–5 claim, must satisfy the PSLRA's

heightened pleading requirements.  Lustgraaf, 619 F.3d at 874.

## Discussion-Allegations of Falsity[9]

**A.    First Quarter Fiscal Year 2009**

### Defendants' Statements

On January 7, 2009, Monsanto announced its first-quarter 2009 results and raised its ongoing earnings-per-share (EPS) guidance for the year from a range of $4.20 to $4.40 to a range of $4.40 to $4.50.[10]  Monsanto also projected gross profit in the Roundup/glyphosate business of $2.4 to $2.5 billion for the year, but predicted it would fall to $1.9 billion in 2012.   Defendant Hugh Grant, Monsanto's Chairman, President and Chief Executive Officer, is quoted in the earnings press release as stating, "Our Latin American business once again displayed its strength and set the pace for a great fiscal 2009, giving us confidence to raise our earnings projections and helping us take another solid step toward fulfilling our 2012 gross profit commitments."  Monsanto also reported that sales in the first quarter for its Agricultural Productivity segment grew 28 % ($337 million), largely from "higher net selling prices and higher sales volumes of the company's Roundup and other

---

[9]For the convenience of the reader, I group defendants' statements and the analysis of these statements together by quarter.  I have also structured my opinion this way to make clear that I have considered all of the allegations and evidence presented in this case, not just the selected statements the parties chose to discuss in their briefs.

[10]Monsanto actually met this goal and reported earnings of $4.41 per share.

glyphosate-based herbicides in Brazil along with higher net selling prices in all

major world areas." The January 7, 2009, earnings release includes the following

language:

> Certain statements contained in this release are 'forward-looking
> statements,' such as statements concerning the company's anticipated
> financial results, . . . future product performance, . . . business and
> financial plans and other non-historical facts . . . [S]ince these
> statements are based on factors that involve risks and uncertainties,
> the company's actual performance and results may differ materially
> from those described or implied by such forward-looking statements.

> Factors that could cause or contribute to such differences include,
> among others: continued competition in seeds, traits, and agricultural
> chemicals; the company's exposure to various contingencies,
> including . . . public acceptance of biotechnology products; the
> success of the company's research and development activities; . . . the
> accuracy of the company's estimates related to distribution inventory
> levels; . . . the effect of weather conditions . . . on the agricultural
> business or the company's facilities; and other risks and factors
> detailed in the company's most recent Form 10-K Report. . . .

Monsanto's Form 10-K Report contains the following warnings of "some of the

important reasons that actual results may be materially different from those that we

anticipate":

> --Competition in seeds and traits and agricultural chemicals has
> significantly affected, and will continue to affect, our sales . . . Our
> competitors' success could render our existing products less
> competitive, resulting in reduced sales compared to our expectations
> or past results. We expect to see increasing competition from
> agricultural biotechnology firms and from major agrichemical, seed
> and food companies. We also expect to face continued competition
> for our Roundup herbicides . . . The extent to which we can realize

cash and gross profit from these products will depend on our ability to
. . . predict and respond effectively to competitor pricing and
marketing; provide marketing programs meeting the needs of our
customers and of the farmers who are our end users; maintain an
efficient distribution system, and develop new products with features
attractive to our end users.

--The successful development and commercialization of our pipeline
products will be necessary for our growth.  The processes of breeding,
biotechnology trait discovery and development and trait integration
are lengthy, and a very small percentage of the genes and germplasm
we test is selected for commercialization . . .

--Our ability to match our production to the level of product
demanded by farmers or our licensed customers has a significant
effect on our sales, costs, and growth potential.  Farmers' decisions
are affected by market, economic and weather conditions that are not
known in advance . . . However, product inventory levels at our
distributors may reduce sales in future periods, as those distributor
inventories are worked down.  In addition, inadequate distributor
liquidity could affect distributors' ability to pay for our products and,
therefore, affect our sales . . . .

On a January 7, 2009 conference call, defendant Terry Crews stated that

Monsanto expected the "U.S. Roundup business to still be strong" and to see "solid

growth in the U.S. seeds and traits business."  He said, "I think we're up about

$300 million of GP in the first quarter, largely driven by Brazil, . . . We're talking

about another 2 to $300 million in the rest of the year and that's largely going to be

driven by our US business . . . ."  In response to a participant's question about

"what incentivizes the farmer to prepay [seed]," Crews responded that "one

[reason] is orders improving and the pace of orders picking up in December and

- 17 -

January and that's -- that is largely driven by people wanting to lock in particular

seed at that point.  The prepay program is really more of financial management

program for the growers . . . ."  In the same call, another Monsanto executive

reminded participants that "this call will include statements concerning future

events" and as such, "the Company's actual performance and results may vary in a

material way from those expressed or implied in any forward-looking statements."

Participants were directed to Monsanto's 10-K and press release for a "description

of the factors that may cause such a variance."

    The next day, Monsanto filed its 10-Q for first quarter fiscal 2009, which

made similar statements, including for example, that Monsanto "expect[ed] to see

increased gross profit as [its] higher-margin seeds and traits business grows and [it]

realize[s] the full-year impact of improved average net selling prices in [its]

Roundup business."  Page 1 of the Form 10-Q contains the following cautionary

language regarding forward-looking statements:

> [W]e share our expectations for our company's future performance . .
> . Since these statements are based on factors that involve risks and
> uncertainties, our company's actual performance and results may
> differ materially from those described or implied by such forward-
> looking statements.  Factors that could cause or contribute to such
> differences include, among others: continued competition in seeds,
> traits and agricultural chemicals; the company's exposure to various
> contingencies, including those relating to intellectual property
> protection, regulatory compliance and the speed with which approvals
> are received, and public acceptance of biotechnology products; the

success of the company's research and development activities; . . . fluctuations in commodity prices; . . . the accuracy of the company's estimates related to distribution inventory levels; the company's ability to fund its short-term financing needs and to obtain payment for the products that it sells; the effect of weather conditions, natural disasters and accidents on the agriculture business or the company's facilities; and other risks and factors described or referenced in . . . . our Report on Form 10-K for the fiscal year ended Aug. 31, 2008.

The Outlook section of the Form 10-Q states in relevant part as follows:

In the Seeds and Genomics segment, our seeds and traits business is expected to expand.  In the Agricultural Productivity segment, our glyphosate business grew through increases in our average net selling prices, and our selective chemistry business is expected to decline . . . In 2009, we also expect to see increased gross profit as our higher-margin seeds and traits business grows and we realize the full-year impact of improved average net selling prices in our Roundup business . . . We believe that our seeds and traits businesses will have significant near-term growth opportunities through a combination of improved breeding and continued growth or stacked and second-generation biotech traits . . . We believe our Roundup herbicide business will continue to generate a sustainable source of cash and gross profit.  Prices of generic formulations of glyphosate herbicides will continue to generate a sustainable source of cash and gross profit.  Prices of generic formulations of glyphosate herbicides increased during 2008.  The generic and private-label pricing can be somewhat unstable during the short-term, but we believe both the short- and long-term trends will be favorable relative to the previous three-year period.  We have experienced increased demand in recent years, and we are increasing production capacity at our Luling, Louisiana plant to meet the anticipated future demand for Roundup, as well as for our glyphosate supply business.

At a February 10, 2009 investor conference, Crews reaffirmed that

Monsanto "still expect[ed]" to "more than doubl[e] the gross profit between 2007

- 19 -

and 2012" and was "comfortable that [it was] still staying on that trajectory."[11]

After reminding the participants that he would be making some "forward-looking

statements," Crews stated:

> And the Roundup business this year is reaching what will be its peak,
> I believe, in terms of gross profit -- in terms of annual gross profit
> growth.  What we've seen in the last few years, based on changes that
> we've made in Roundup a few years ago to lower our cost position,
> reduce our working capital investment in that portfolio, and to make
> sure that we're only resourcing our facilities to make sure we maintain
> a low-cost producer.  And as a result of that we've seen improved
> profitability and gladly taking advantage of a situation where supply
> and demand was out of balance or increased supply over demand.

> And as a result of that we think this year our gross profit in Roundup's
> going to be in the $2.4 billion to $2.5 billion range.  And that  gross
> profit growth is going to come from a combination of higher pricing --
> probably $20-plus in the brand -- but probably lower volumes this
> year, particularly on the non-branded side of our business.  But that
> combination is going to result in a gross profit this year in $2.4 billion
> to $2.5 billion.

>  . . . I do believe that this year is the peak in Roundup, and I think we'll
> begin to see a decline in Roundup.  So I'm comfortable to tell you that it will
> come down in price and will come down in GP and probably moving toward
> our $1.9 billion objective in 2012.

A week later defendant Carl Casale, Executive Vice President of Strategy and

Operations,  appeared at a separate investor conference and said that Monsanto was

---

[11]Crews' presentation included cautionary language regarding forward-looking
statements that is nearly identical to the language in the January 7, 2009 earnings release and the
Form 10-Q.  This language appears in substantially the same format in all of Monsanto's filings,
presentations, and releases at issue.  I may refer to this language as the standard safe-harbor
language.

- 20 -

clearly "on track" to meet that projection and "expected that [its] Roundup

franchise will be from approximately $2.4 billion, $2.5 billion of gross profit this

year."[12]  Monsanto made similar statements at the Credit Suisse 14th Annual

Global Ag Productivity Conference on March 10, 2009.[13]

Plaintiff's Allegations That Defendants' Statements Were False or Misleading

Plaintiff's second amended complaint alleges that Monsanto enjoyed

increased profits when it materially increased the price of Roundup in 2008 due to

a glyphosate supply shortage.  Plaintiff alleges the shortage resulted, in part, "from

a reduction in Chinese manufacturing due to higher fuel costs, stricter

environmental guidelines imposed by the Chinese government in anticipation of

the 2008 Olympic Games, and an earthquake in China that disrupted production of

glyphosate."  However, plaintiff alleges that Chinese manufacturers returned to the

market in the fall of 2008, raising questions about whether Roundup would

continue to generate the same high level of profits enjoyed in fiscal 2008.

Plaintiff alleges that the statements made by Monsanto in the first and

second quarters of fiscal year 2009 were false and misleading because defendants

had failed to disclose that: demand for Roundup had materially declined and the

---

[12]Casale's presentation included the same safe-harbor language as Crews' presentation.

[13]Monsanto's press release announcing its presentation at the conference contains the standard safe-harbor language.

inventory was materially increasing due to Monsanto's "high prices;" competitive prices of glyphosate, "which defendants used to establish Monsanto's gross profitability targets, had dramatically declined;"[14] and, Monsanto's competitors, Dow and Syngenta, were selling glyphosate at a material discount to gain market share, which "materially, negatively affected" the sales of Monsanto's seeds.[15]

Plaintiff cites Confidential Informant 3, a former inventory manager for Monsanto during the relevant time period, as the source for information about Monsanto's inventory. The second amended complaint alleges:

> 55. The dramatic change in market dynamics was also apparent in Monsanto's inventory that had materially increased prior to the Class Period. According to [Confidential Informant 3], at the beginning of Monsanto's 2009 fiscal year (September 1, 2008), inventory of glyphosate was very low. By early November 2008, glyphosate inventory had increased by approximately 500,000 Roundup Equivalent Gallons ("REGs") per week. The increase in inventory was discussed at weekly Product Availability ("PAV") and Supply Effectiveness Team ("SET") meetings. On a weekly basis, the inventory of glyphosate was monitored and the inventory levels would be reported in a chart in a Tactical Supply & Operations Planning memo for a monthly meeting.

---

[14]Plaintiff alleges that defendants "were fully aware" by the first week of January 2009 that competitive prices "for glyphosate plunged from $6 per kilogram in September 2008 to approximately $3.60 per kilogram."

[15]Plaintiff cites Confidential Informant 1 (a seeds and traits representative for Monsanto in Kansas and Oklahoma) and Confidential Informant 2 (an agronomy manager at an agricultural supplier to farmers in Wisconsin) as the source for this information. The amended complaint alleges that, "[a]ccording to CI 1 and CI 2, Monsanto's competitors were selling glyphosate as a loss leader, i.e. below cost to entice customers to purchase additional products."

56. According to CI 3, at the monthly TSOP meetings, the meeting
participants "looked for places to put this stuff," referring to
glyphosate, beginning in November 2008. Defendants materially
increased both the terminal and rail storage space to store excess
glyphosate inventory. For example, approximately 1.6 million gallons
of storage space was added in Houston, Texas, Harrold, South Dakota
and Brooton, Minnesota in February 2009. According to CI 3,
Monsanto's lease of space in a storage facility in Houston, Texas was
unprecedented because "nobody bought glyphosate in Houston."
Further, Monsanto used a material portion of its leased-railcar fleet to
store excess inventory in the Budweiser rail yard in St. Louis.
Moreover, a material amount of 30 gallon drums of Roundup
PowerMAX were stored in Fresno, California.

Plaintiff's second amended complaint further alleges that Monsanto's inventory

build-up was accompanied by a decline in sales in late 2008. "According to CI 3,

Amy Halleran, Senior Customer Operations Specialist, presented reports at the

TSOP meetings that reflected a material and continuous decline in sales volume

and, accordingly, forecasts for glyphosate sales were materially lowered." Plaintiff

alleges that "CI 3 personally informed Defendant Begemann about the increase in

glyphosate inventory." The second amended complaint cites another confidential

informant, CI 4 (a former Monsanto employee that sold Roundup), as the source of

its information that "throughout 2009 [] there 'was a lot of excess Roundup which

sat in tanks . . . due to lower demand.'"

According to Confidential Informant 5 (a marketing manager at a Monsanto

subsidiary), "material damage was done to Monsanto's image and customer

demand for Monsanto's soybean and corn seed products" because Monsanto "materially overpriced glyphosate."  The amended complaint alleges that CI 5 heard "a lot of turbulent messages" from farmers about Roundup performance, relayed his frustration at Monsanto's sales expectations and "blatant disregard of the widespread negative sentiments" to Monsanto, and was told "that the sales problems were national and that Monsanto's corporate office was aware of the trend."  CI 1 also allegedly observed farmers switching to generic glyphosate because the price of Roundup was too high.

The second amended complaint alleges that "alarm bells went off inside Monsanto" in March of 2009 because glyphosate inventory was so high (18 million REGs).  Plaintiff cites Confidential Informant 6 (a former member of Monsanto's finance department) and Confidential Informant 7 (a former financial analyst who "supported" Monsanto) as the sources of its allegation that "starting in February and March 2009, the decline in glyphosate was so steep that Monsanto's finance department began to plan material cuts to certain expenses.  CIs 6 and 7 understood that the material reduction in expenditures was needed for Monsanto to meet its projected earnings per share for fiscal 2009."

<u>Analysis</u>

Almost all of the statements being challenged by plaintiff in this case are

- 24 -

forward-looking statements as defined by the Exchange Act because they include projections of revenues, income, earnings, statements of future economic performance, statements of plans and objectives of management for future operations, and the assumptions "underlying or relating to" such statements. The tense of the statement is not determinative; rather, "the key is whether its truth or falsity is discernible only after it is made." Panera Bread, 697 F. Supp. 2d at 1093. Like the plaintiffs in Panera Bread, plaintiff here challenges as fraudulent all of defendants' projections about quarterly earnings per share and sales growth, and its projections about doubling gross profit by 2012. Plaintiff argues that defendants knew they could not meet these projections because they were aware that their growth strategy (through Roundup and the newest seeds and traits business) was failing. But defendants' forecasts of future sales and earnings and doubling gross profit are the "sorts of projections [that] are quintessential forward-looking statements." Id. This remains true regardless of the tense of some of these statements because they do not make any "specific, verifiable representation about the present state of affairs." Id. at 1094. Statements that Monsanto "was still staying on [the] trajectory" of doubling gross profit and was "on track" "while in the present tense, are inherently forward-looking." In re Federal-Mogul Corp. Securities Litig., 166 F. Supp. 2d 559, 565 (E.D. Mich. 2001). They are not, as

plaintiff argues, factual statements of Monsanto's current performance.  It is also clear that statements about Monsanto expecting to see increased gross profit as its seeds and traits business grows, when read in context, are also forward-looking as an assumption underlying defendants' projections about Monsanto's performance going forward, as well as statements of the plans and objectives for future operations.  As such, these forward-looking statements are protected by the safe harbor provision of the Exchange Act if they are accompanied by meaningful cautionary statements.

The cautionary language accompanying the forward-looking statements is meaningful as a matter of law because it is substantive and addresses risks specific to Monsanto's business.  Indeed, *defendants repeatedly warned of the very risks that plaintiff alleges they failed to disclose*, including: "competition in seeds and traits and agricultural chemicals has significantly affected, and will continue to affect, our sales;" "increasing competition from agricultural biotechnology firms and from major agrichemical, seed and food companies,"  specifically "continued competition for our Roundup herbicides;" and, "our ability to match our production to the level of product demanded by farmers or our licensed customers has a significant effect on our sales, costs, and growth potential."  These are not generic, boilerplate risks that could apply to any business -- they are specific

warnings about the volatility in the glyphosate business, the competition faced by
Roundup, and issues with respect to levels of production and demand affecting
sales.  These warnings were repeated by Crews in February, when he told investors
that Roundup was "reaching its peak" in annual gross profit growth and that it
would begin to decline in price and gross profit.  Similarly detailed cautionary
language accompanied each of defendants' statements at issue.

 I am also not persuaded by plaintiff's argument that defendants' cautionary
language is not meaningful simply because it "remained virtually unchanged"
during the relevant time period.  While some of the language used in Monsanto's
public filings was similar, the warnings were specific to Monsanto's business and
were indeed the very risks that, according to plaintiff, caused Monsanto to miss its
targeted projections.  Moreover, Monsanto's cautionary language included more
than just those risk factors disclosed in public filings.  During conference calls and
other public statements, defendants continually warned investors of these specific
risks, including competition in the glyphosate market and the challenges and
setbacks associated with the launch of new products.  The language is simply not
the type of rote, boilerplate language found insufficient under the Act by other
courts.  While defendants may have underestimated the effect of these risks to its
glyphosate business, they did not mislead investors or falsely deny that these risks

existed.

In a last-ditch effort to avoid the safe harbor provision, plaintiff argues that it does not apply because the statements were false at the time they were made.  I agree with Judge Webber's conclusion in Panera Bread that "a forward-looking statement is protected if it is immaterial or identified as forward-looking and accompanied by meaningful cautionary language, regardless of whether the speaker knows the statement is false."  697 F. Supp. 2d at 1089; see also, W. Washington Laborers-Employers Pension Trust v. Panera Bread Co., 2009 WL 3756619, at *2-*3 (E.D. Mo. Nov. 6, 2009).  Defendants' forward-looking statements were accompanied by meaningful cautionary language and are not actionable under the safe harbor provision of the Act.

To the extent plaintiff argues that Crews' January 7, 2009 statement about "orders improving and the pace of orders picking up in December and January" constitutes a present statement of verifiable fact, it completely misreads the context of this statement.  Crews was responding to a question about what drives a hypothetical farmer to prepay for seed, and he responded that a farmer may want to lock in a particular seed in December or January.  It is clear that Crews was speculating on the motives of a hypothetical farmer and not making any factual statements about Monsanto's seed business.  For plaintiff to suggest otherwise

- 28 -

grossly misstates the record in this case.

Statements about how a product is performing relative to expectations are, as a general matter, inactionable puffery under the Exchange Act. Panera Bread, 697 F. Supp. 2d at 1094 n.5; see Johnson v. Tellabs. Inc., 262 F. Supp. 2d 937, 951 (N.D. Ill. 2003) (statements such as "demand for that product is exceeding out expectations" and "we feel very, very good about the robust growth we're experiencing" are "nothing more than puffery and cannot be the basis of a cause of action."). Defendants' comments that Monsanto expected "solid growth" and the Roundup business to be "strong" do not contain any specific, concrete factual representations as to present facts. Instead, they are inactionable puffery about performance relative to expectations. See Parnes v. Gateway 2000, Inc., 122 F.3d 539, 547 (8th Cir. 1997)("[S]ome statements are so vague and such obvious hyperbole that no reasonable investor would rely upon them . . . soft, puffing statements generally lack materiality because the market price of a share is not inflated by vague statements predicting growth. No reasonable investor would rely on these statements . . . .") (internal quotation marks and citations omitted).

Plaintiff argues that defendants had a duty to disclose additional facts -- such as the amount that Roundup inventory was increasing and that Dow and Syngenta were selling glyphosate at a material discount -- so that their statements would not

be rendered materially false or misleading.  The Supreme Court in <u>Matrixx</u> wrote:

> [I]t bears emphasis that § 10(b) and Rule 10(b)-5 do not create an
> affirmative duty to disclose any and all material information.
> Disclosure is required under these provisions only when necessary to
> make . . . statements made, in the light of the circumstances under
> which they were made, not misleading.  Even with respect to
> information that a reasonable investor might consider material,
> companies can control what they have to disclose under these
> provisions by controlling what they say to the market.

<u>Matrixx</u>, 131 S. Ct at 1321-22 (internal quotation marks and citations omitted); <u>see</u>

<u>also</u> <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 239 n. 17 (1988) ("Silence, absent a

duty to disclose, is not misleading under Rule 10b-5.").  "A fact is material if it is

substantially likely that the disclosure of the omitted fact would have been viewed

by the reasonable investor as having significantly altered the total mix of

information made available."  <u>In re K-Tel International, Inc. Securities Litig.</u>, 300

F.3d 881, 897 (8th Cir. 2002) (quoting <u>Levison</u>, 485 U.S. at 231-32).  "Materiality

alone is not sufficient to place a company under a duty of disclosure . . . the law

requires an actor to provide complete and non-misleading information with respect

to the subjects on which he undertakes to speak."  <u>K-tel</u>, 300 F.3d at 898 (internal

quotation marks and citations omitted).  Here, plaintiff falls far short of

demonstrating that disclosure of these additional facts was somehow required.  As

discussed above, defendants repeatedly disclosed continued competition in the

glyphosate market, as well as expected lower sales volumes of Roundup, in the

- 30 -

challenged statements.  Plaintiff's position in this case seems to be that, by making

any statements about the expected performance of Roundup, defendants were then

obligated to disclose every bit of pricing, inventory, and marketing information

underlying these predictions, right down to every comment allegedly made by

"unidentified customers" to "confidential informants."  But the securities laws

impose no such duty, for such a requirement would undoubtedly drown the

reasonable investor in a never-ending -- and ultimately, meaningless -- deluge of

information.  When defendants' statements are viewed as a whole, it is clear that

no disclosure of additional facts is necessary to render them not misleading under

Matrixx.[16]

Of course, even if these statements were not forward-looking or were

otherwise actionable, plaintiff would still have to demonstrate their falsity to avoid

dismissal.  "In order to satisfy the Reform Act's falsity pleading standard, a

complaint may not rest on mere allegations that fraud has occurred . . . The

complaint's facts must necessarily show that the defendants' statements were

misleading."  In re Hutchinson Technology, Inc. Securities Litig., 536 F.3d 952,

958-59 (8th Cir. 2008) (internal quotation marks and citation omitted).  With

---

[16]To the extent plaintiff attempts to make this argument with respect to the forward-looking statements, it fails because they are protected under the safe harbor provision of the PSLRA, which applies even if the statements are based on "an untrue statement of material fact or omission of a material fact."  15 U.S.C. § 78u-5(c)(1).

projections about future sales and earnings, this is very difficult because "corporate officials need not be clairvoyant." In re Navarre Corp. Securities Litig., 299 F.3d 735, 743 (8th Cir. 2002) (internal quotation marks and citation omitted). Merely using hindsight to demonstrate a statement is false is insufficient to meet the heightened pleading standard of the PSLRA; "[i]nstead, the complaint must indicate why the alleged misstatements would have been false or misleading at the several points in time in which it is alleged they were made." In re Cerner Corp. Securities Litig., 425 F.3d 1079, 1083 (8th Cir. 2005).

I agree with defendants that the Eighth Circuit's decision in Cerner is instructive on this issue. The complaint in Cerner alleged that the defendants' favorable statements regarding future earnings were materially false and misleading because the company was losing deals due to increased competition, dissatisfied customers, a general economic downturn, an inexperienced sales force, and a neglect of smaller deals. Affirming the district court's dismissal of the complaint, the Eighth Circuit held:

> The complaint is devoid, however, of any indication that this alleged loss of deals, even if 'material,' is necessarily inconsistent with Cerner's statements that its demand was 'strong.' A company could conceivably lose a material number of deals it had pursued, and yet continue to see a strong demand for its products and substantial future opportunities. Furthermore, there is no indication on the face of the complaint that even a material loss of deals necessarily rendered Cerner unable to achieve its projected earnings. Finally, and perhaps

> most importantly, the complaint does not identify a single specific
> deal that was lost due to alleged changes in Cerner's corporate
> structure and strategies.  Without any indication that an undefined loss
> of sales necessarily would affect the company's overall demand or its
> ability to meet its future earnings projections, these allegations cannot
> survive the Reform Act's falsity standard.

Id. at 1084.  Like the challenged statements in Cerner, Monsanto's future

projections and statements that Roundup would continue to generate "a sustainable

source of cash and gross profit" are not necessarily inconsistent with alleged

decreasing sales.  Indeed, a reasonable investor (and the Court) could easily

conclude that Roundup could continue to provide a "sustainable source of cash and

gross profit" even with softening demand.  Furthermore, there is no indication on

the face of the complaint that even a material decline in sales necessarily rendered

Monsanto unable to achieve its projected earnings.[17]   As defendants point out, the

glyphosate market was extremely volatile so the price of generic glyphosate at any

given point in January of 2009 would not necessarily render the forecasts for the

entire fiscal year false, let alone the predictions for 2012.  This is particularly true

---

[17]I disagree with both parties' interpretation of Cerner.  I do not agree with defendants
that Cerner requires a plaintiff to plead facts demonstrating that projections were "necessarily
unattainable" to meet the PSLRA's falsity pleading standard.  Nor do I agree with plaintiff that
the Supreme Court's decision in Matrixx, which discussed the materiality element of a Rule 10b-
5 claim and not the falsity element, "implicitly overruled" the Eighth Circuit's decision in
Cerner.  See Hill v. Gonzani, 651 F.3d 151, 152 (1st Cir. 2011).  Instead, the Cerner Court
reviewed plaintiffs' failure to plead that the projections were necessarily unattainable as one
factor out of several demonstrating that plaintiffs could not demonstrate falsity, and that is how I
apply it here.

because the price of generic glyphosate was only *one* of the factors used to forecast the profitability of Roundup.  Under these circumstances, these allegations cannot survive the PSLRA's falsity standard.  In sum, I find no actionable statements for the first quarter of fiscal year 2009.

**B.     Second Quarter Fiscal Year 2009**

<u>Defendants' Statements</u>

On April 2, 2009, Monsanto issued a press release announcing its second-quarter-2009 results and reaffirming its EPS guidance in the range of $4.40 to $4.50.  At the same time, Monsanto also announced that Roundup sales had decreased 21% compared with the prior year's second quarter, but it expected orders to shift back to previous selling patterns in the "third and fourth quarters."[18] The press release states that the decrease was "largely a timing effect, as our customer's shipments were ahead of a pre-announced price increase . . . additionally, results in the quarter were also affected by lower branded volumes of glyphosate due to the drought conditions in Latin America."  Monsanto repeated these statements on a conference call held the same day.[19]   In this call, Crews also

---

[18]This press release contains the same safe-harbor language as the January press release.

[19]The conference call began with a statement from a Monsanto executive reminding participants "that this call will include statements concerning future events and financial results." Because of this "risk and uncertainty," the Monsanto executive cautioned participants that "the Company's actual performance and results may vary in a material way" and directed them to the

predicted that "Roundup gross profit for the full fiscal year will be approximately

$2.4 billion.  This is supported by the fact that we have reached the half-way mark

of $1.2 billion in gross profit already."  Crews warned that the "Roundup business

is likely to become more competitive" as the Chinese "bring more volume online."

Chief Executive Officer, defendant Grant, then spoke and reiterated the prediction

that Roundup gross profit would peak in 2009 and decline to approximately $1.9

billion by fiscal 2012.  He stated that he did not know whether Roundup gross

profit would reach "steady state in 2010 or 2012, or if the path between them will

be steep or rolling.  They are all possible."  Grant also reported strong sales in

Seeds and Genomics and predicted "gross profit . . . to top $7 billion."

　　　　Monsanto's Form 10-Q issued on April 3, 2009, contains the same

cautionary language regarding forward-looking statements as the previous Form

10-Q.  The form states Monsanto's belief that is "positioned to sustain earnings

growth and strong cash flow" and that it "expects to see increased gross profit as

[its] higher-margin seeds and traits business grows and [it] realizes the full-year

---

cautionary language in the Form 10-Q and the April press release.  The presentation also
included materials containing the standard safe-harbor language.  The executive then gave a brief
summary of Monsanto's second quarter results, stating that "growers have steadily been buying
our higher performing higher value soybean products in a year when we expect more acres of
soybeans to surpass last year's record setting crops."  Although paragraph 158 of the second
amended complaint alleges this statement is "false and misleading," plaintiff offers no
explanation as to how or why this is so.

impact of improved average net selling prices in our Roundup business." It also

predicts that Roundup sales would "peak in 2009 and continue to generate a

significant source of cash and gross profit thereafter." In the Outlook section,

Monsanto reported in relevant part as follows:

> In the Seeds and Genomics segment, our seeds and traits business is
> expected to expand . . . . We believe that our seeds and traits
> businesses will have significant near-term growth opportunities
> through a combination of improved breeding and continued growth of
> stacked and second-generation biotech traits . . . We believe our
> Roundup herbicide business will peak in 2009 and continue to
> generate a significant source of cash and gross profit thereafter.
> Prices of generic formulations of glyphosate herbicides increased
> during 2008. Against a background of increased global capacity and
> softening raw material values, prices of generic formulations of
> glyphosate are now trending back towards prior level. We have
> experienced increased demand in recent years, and we are increasing
> production capacity at our Luling, Louisiana plant to meet the
> anticipated future demand for Roundup, as well as for our glyphosate
> supply business. We will continue to actively manage our inventory
> and other costs and offer production innovations, superior customer
> service and logistics and marketing programs to support or allow us to
> maintain premium prices commensurate with our brands' value.
> Further expansion of crops with our Roundup Ready traits may also
> incrementally increase sales of our Roundup products.

At a May 13, 2009 conference, Monsanto reaffirmed that it was "on track"

to double gross profits from 2007 to 2012. On May 27, 2009, Monsanto issued a

press release and held an investor conference. The press release states that

Monsanto "is on track to meet the lower end of its previous ongoing earnings

guidance for fiscal year 2009" of $4.40 per share. Monsanto also announced that

its Roundup business would likely generate about $2 billion gross profit in fiscal

year 2009, "down from its previous forecast of $2.4 billion."  The release states

that "application of [Roundup] is half that compared with product use at the end of

May 2008" and notes that the "supply of glyphosate is now exceeding demand

globally."  The release cites weather and increased competition from generic

glyphosate suppliers[20] as among the reasons for the gross profit decline in

Roundup, but predicts it will be offset by the "continued outstanding performance

from [Monsanto's] seeds and traits business."  The press release contains

substantially the same cautionary language as appears in the Form 10-Q.  During

the conference, Grant acknowledged that the "cold, wet spring" and "large volume

of Chinese generic material" in the marketplace contributed to the revised

Roundup forecast.  He then stated that Monsanto would "reassess the path forward

with Roundup.  There was an inevitability in this.  It was always coming.  We

always said it was going to get smaller . . . ."  However, Grant predicted that

"despite the decline of Roundup to that $2 billion dollar level in gross profit, we

still see the overall opportunity in growing the business by about 20% even with

---

[20]It says that "generic and other branded competitors continue to aggressively more
larger-than-expected volumes of lower-priced material into the market place."

that Roundup softness."[21]

Plaintiff's Allegations That Defendants' Statements Were False or Misleading

Plaintiff relies on the same facts discussed in connection with the first
quarter fiscal year 2009 as evidence that defendants' statements in the second
quarter were false and misleading.   Plaintiff also alleges that these statements were
false and misleading because "the launch of Monsanto's new Roundup Ready 2
Yield soybeans for the 2009 growing season was a failure because defendants
could not sell the new seeds at premium prices.  In fact, sales were so poor that
Monsanto's retailers materially discounted the price of Roundup Ready 2 Yield to
prices near those for Roundup Ready I seeds."

Analysis

I have already concluded that defendants' projections of revenues, income,
and earnings, statements of plans and objectives for future operations, statements
of future economic performance, and the assumptions "underlying or relating to"
these statements are forward-looking statements subject to the safe harbor
provision.  This includes predictions of gross profit (including the prediction of an
"overall opportunity in growing the business by about 20%"), Roundup gross

---

[21]Grant's presentation included the standard safe-harbor language regarding forward-
looking statements.

- 38 -

profit, gross profit for Seeds and Genomics "topping $7 billion," increased profit for the seeds and traits business (and the underlying assumption that it would be caused by improved breeding and continued growth of stacked and second-generation biotech traits), as well as the predicted guidance numbers.

I also find that these forward-looking statements are accompanied by meaningful cautionary language for the reasons previously discussed.   In addition to the specific, detailed risks set out in the press releases and the Form 10-Q, defendants' statements made during the April and May conferences also included appropriate cautionary language regarding forward-looking statements. Defendants also expanded on these risks in the statements themselves.  For example, in the April conference call Grant warned participants that he did not know whether Roundup gross profit would reach "steady state in 2010 or 2012, or if the path between them will be steep or rolling.  They are all possible."  Crews echoed the warning, stating that the Roundup business "is likely to become more competitive" as the Chinese "bring more volume online."  The May press release cites weather and increased competition from generic glyphosate suppliers as among the reasons for declining gross profit of Roundup and warns of excess supply and decreasing demand.  Grant reiterated these same concerns during the May investor conference.  He told them that "it [decreased Roundup profits] was

- 39 -

always coming.  We always said it was going to get smaller . . . ."  These identified

risks were detailed and specific to Monsanto's business and the changing

conditions of the marketplace.  Under these facts, I find that defendants' forward-

looking statements were accompanied by meaningful cautionary language and are

not actionable under the safe harbor provision of the Exchange Act.

Plaintiff argues that the April 2, 2009 press release includes a present

statement of verifiable fact that decreased Roundup sales were due to a pre-

announced price increase.  Again, plaintiff takes the statement out of context,

which states that decreased sales were "largely" the result of that effect, but also of

drought conditions in Latin America.  Plaintiff presents no evidence that this

statement, when read in its entirety, is false or misleading as is required to state a

claim under the Act, particularly when considered as a whole with all of the

available information about Roundup's declining sales.  Plaintiff also fails to

demonstrate that defendants' statements about its soybean and seeds and traits

business are false and misleading.  First, the statement about growers "buying our

higher performing, higher value soybean products" does not even specifically

address the Roundup Ready 2 Yield soybeans, much less the price or volume of

Roundup Ready 2 Yield soybean purchases.  I also agree with defendants that the

statement about "growers steadily buying" products constitutes inactionable

- 40 -

puffery. Second, as explained by Crews in the April 2 conference call, the launch of Roundup Ready 2 Yield in 2009 was a "pre-commercial introduction" limited to just 1.5 million acres.  There is no evidence that this limited pre-launch was a "failure"[22] or that its results somehow rendered defendants' statements regarding its seeds and traits business false or misleading.

Plaintiff also argues that Monsanto's statement in its Form 10-Q that the Company had "experienced increased [glyphosate] demand in recent years" is a misleading statement of verifiable fact.  Although not a forward-looking statement, there is no evidence that it is either false or misleading.  In fact, plaintiff's second amended complaint alleges that Monsanto had experienced increased glyphosate demand in the years preceding April of 2009.  Because this statement accurately reported *past* historical fact and contains no representations of present or future demand, it is not actionable.  My review of the record reveals no actionable statements for the second quarter of fiscal year 2009.

## C.     Third Quarter Fiscal Year 2009

<u>Defendants' Statements</u>

On June 24, 2009, Monsanto issued a press release announcing its third

---

[22]Plaintiff points to allegations that relate to events that took place after the second quarter of 2009.

quarter results.  In it, Grant stated that "[o]ur 2009 fiscal year represents a milestone for our business as our seeds and traits business alone will deliver more gross profit than all of Monsanto did in 2007, a remarkable achievement in just two short years."  Grant also reiterated that Monsanto "remain[s] committed to doubling gross profit for the entire company from the 2007 base of $4.2 billion to roughly $8.6-to-8.8 billion in 2012."[23]  However, the press release acknowledges declining sales in the Agricultural Productivity segment, which it attributes to "increased pressure from generic glyphosate and other branded competitors who continue to aggressively move larger-than-expected volumes or lower-priced material into the marketplace and to a lesser extent by cold, wet weather in parts of the U.S. corn belt."  Monsanto also reported "increased revenues from seed and traits products," "estimat[ing] that some 16,000-plus farmers [in the United States] are using the Genuity brand Roundup Ready 2 Yield trait on approximately 1.4 million to 1.5 million acres this season."  The press release states that "Monsanto believes that customer demand for its branded corn seed products has contributed to an eighth consecutive year of share gains in the U.S. corn seed sales."  Finally, the press release announces the creation of a separate division for Roundup, "to

_____

[23]The press release contains the standard safe-harbor language used in previous press releases and the Form 10-Q.

deliver optimal gross profit and a sustainable level of operating cash in the

upcoming seasons."

In an earnings conference call held later that day,[24] Grant repeated

Monsanto's projection that, "[i]n 2009, Roundup should be flat at $2 billion in

gross profit, and we now believe it will deliver something in the neighborhood of

$1 billion longer-term."  He also stated that "by 2012, the Seeds and Traits

segment is forecast to deliver $7.3 billion to $7.5 billion in gross profit," although

he acknowledged that "even [Monsanto's] amazing Seeds and Traits business

cannot in one year offset a $1 billion decline in Roundup gross profit."  Grant

stated:

> [By 2012], Roundup by then will be less than 15% of the Company's
> total gross profit generation.  So even as we reset the financial bar for
> Roundup, we remain committed to doubling gross profit for the entire
> company from the 2007 base of $4.2 billion to roughly $8.6 billion in
> 2012 . . . To be fair, we thought Roundup would level out at $1.9
> billion in gross profit, we said then that we could more than double.
> But even with a lower benchmark for Roundup, the seeds and traits
> business is expected to grow at more than 2.5 times its 2007 base and

---

[24]The conference call began with the following statement from a Monsanto executive:

I need to remind you that this call will include statements concerning future
events and financial results.  Because these statements are based on assumptions
and factors that involve risk and uncertainty, the Company's actual performance
and results may vary in a material way from those expressed or implied in any
forward-looking statements.  A description of the factors that may cause such a
variance is included in the safe harbor language contained in our most recent 10-
Q and today's press release.

allow us to cross this doubling milestone for the entire corporation.[25]

Grant also called the Roundup Ready 2 Yield soybeans one of the "four big drivers

of our success in 2010," with "some 16,000 plus farmers [] experiencing the

Roundup Ready 2 Yield trait on an estimated 1.4 million to 1.5 million acres.  That

penetration, we expect, accelerates the 7 million to 8 million acres in 2010, with a

total market opportunity of 45 million to 55 million acres."

In the same call, Casale explained that the revised Roundup outlook could be

explained by a more rapid "rate of decline in the pricing from the competition, . . .

and the sheer volume of competitive products sitting in the distribution channel,"

which he described as "unprecedented."   Although "believ[ing] the demand for

glyphosate globally will continue in the low single digits, with additional Roundup

Ready acres and continued conversion to conservation tillage practices," Casale

explained that Monsanto "[is] facing a changing supply environment, and what we

need to determine is the price, volume, [and] share dynamic that will deliver the

optimal gross profit and ultimately the optimal level of operating cash.  This may

entail stretched premiums and lower volumes, or at the other end of the spectrum,

---

[25]In response to a participant's question, Grant reiterated that "the reality is that Roundup
is going to be smaller . . . [t]he danger is that it fogs or obscures the extraordinary growth in
seeds and traits . . . So I think getting lost in the Roundup drama, the danger now is you don't see
the extraordinary growth that we . . . are anticipating between now and 2012 in our seed
businesses."

sub-historic premiums and a recapture of share and volume." Casale then

announced that Monsanto would be creating a separate division for Roundup "to

remove the distraction from the rest of the organization." Acknowledging that

"today marks a clear reset in expected contribution from Roundup," Casale stated:

> At the same time, we want to convey to you our confidence in our
> ability to deliver approximately $1 billion in gross profit in 2012, or
> roughly 15% of the estimated gross profit of the entire Company at
> that time. I've mentioned many things that have changed in the
> Roundup environment in recent months, but one thing has not – our
> low-cost manufacturing position. We remain confident in our ability
> to remain the low-cost producer, and in fact have identified further
> areas of improvement.

When asked to elaborate on the 2012 plan for Roundup, Casale responded as

follows:

> [W]hen we went through this cycle last time, the floor at that point
> was about $600 million of gross profit, and we are talking about $1
> billion now. So there is basically two things that drive the
> incremental $400 million of GP. One is we continue to lower our all-
> in manufacturing cost base, so gross margin per unit will be higher
> today than it was previously. And the other one is we have the
> opportunity to sell more volume over this time period than we did last
> time. So it is a combination of those two that will yield the higher
> price. And again, that is an environment that anticipates $3.00 asset.

Crews summarized the conference call by stating that Monsanto "expect[s] 2009 to

be another year with a 20% growth rate for ongoing EPS, to have a path to reduce

the volatility associated with Roundup and still [have] a clear line of sight on

exceptional growth from an unparalleled Seed and Trait franchise . . . ." However,

- 45 -

Crews warned that 2010 could see gross profit "below flat" if "Roundup falls" to the predicted levels.  He stated:

> But the math don't lie.  If you lose $1 billion of GP, if that were to occur in Roundup, it would be difficult to offset that, even with the stellar performance in Seeds and Traits.  And Seeds and Traits will be stellar.  There is no question about that.  We are still talking about an 18% growth curve between here and 2012 to achieve our 2012 numbers.  So by any stretch of the imagination, that is great news for the Seeds and Traits business, but we are dealing with a real downside in Roundup.

In its third-quarter Form 10-Q, filed on June 26, 2009, Monsanto reported that "net sales of Roundup and other glyphosate-based herbicides decreased 47 percent, or $554 million, in the three-month comparison.  In third quarter 2009, net sales of Roundup and other glyphosate-based herbicides decreased in all regions . . . sales volumes in the U.S. decreased primarily due to a softening of customer demand compared to third quarter 2008, driven by increased pressure from generic competition."  Monsanto also stated its belief that "Roundup herbicide gross profit will peak in 2009 at levels similar to 2008, and going forward, will decline."  However, it predicted that "our seeds and traits businesses will have significant near-term growth opportunities through a combination of improved breeding and continued growth of stacked and second-generation biotech traits."  Monsanto stated:

> [W]e believe the [Roundup] business will continue to generate a

strong source of cash and gross profit.  Prices of generic formulations of glyphosate herbicides increased during fiscal year 2008, but against a backdrop of increased global supply and softening raw material prices, generic prices are now trending quickly down.  We have experienced increased demand in recent years, and we are increasing production capacity at our Luling, Louisiana plant to meet the anticipated future demand for Roundup.  We will continue to actively manage our inventory and other costs.

Finally, Monsanto announced its plans to reduce costs and concentrate its resources on its seeds and traits business by creating a separate division for Roundup.  Like the others, Monsanto's third-quarter Form 10-Q contains the following section entitled, "Caution Regarding Forward-Looking Statements":

> [W]e share our expectations for our company's future performance . . . Since these statements are based on factors that involve risks and uncertainties, our company's actual performance and results may differ materially from those described or implied by such forward-looking statements.  Factors that could cause or contribute to such differences include, among others: continued competition in seeds, traits and agricultural chemicals; the company's exposure to various contingencies, including those relating to intellectual property protection, regulatory compliance and the speed with which approvals are received, and public acceptance of biotechnology products; the success of the company's research and development activities; . . . fluctuations in commodity prices; . . . the accuracy of the company's estimates related to distribution inventory levels; the company's ability to fund its short-term financing needs and to obtain payment for the products that it sells; the effect of weather conditions, natural disasters and accidents on the agriculture business or the company's facilities; and other risks and factors described or referenced in . . . . our Report on Form 10-K for the fiscal year ended Aug. 31, 2008.

Monsanto's Form 10-Q also warns that "our forward-looking statements represent

- 47 -

our estimates and expectations that are based on currently available information at the time that we make those statements,  However, circumstances change constantly, often unpredictably, and many events beyond our control will determine whether the expectations encompassed in our forward-looking statements will be realized."

At an investor event held August 13-14, 2009, Grant reiterated that "Monsanto remains on track to more than double 2007 gross profit in 2012."  Page one of the "Complete Logistics and Reference Guide" manual from the event contains a section entitled "Forward-Looking Statements," which states in relevant part as follows:

> Certain statements in this presentation are 'forward-looking statements,' such as statements concerning the company's anticipated financial results, business and financial plans and other non-historical facts . . . since these statements are based on factors that involve risks and uncertainties, the company's actual performance and results may differ materially from those described or implied by such forward-looking statements.  Factors that could cause or contribute to such differences include, among others: continued competition in seeds, traits and agricultural chemicals; the company's exposure to various contingencies, including those relating to intellectual property protection, regulatory compliance and the speed with which approvals are received, and public acceptance of biotechnology products; the success of the company's research and development activities; . . . fluctuations in commodity prices; . . . the accuracy of the company's estimates related to distribution inventory levels; the company's ability to fund its short-term financing needs and to obtain payment for the products that it sells; the effect of weather conditions, natural disasters and accidents on the agriculture business or the company's

facilities; and other risks and factors described in the company's most
recent periodic report to the SEC.  Undue reliance should not be
placed on these forward-looking statements, which are current only as
of the date of this presentation.  The company disclaims any current
intention or obligation to update any forward-looking statements or
any of the factors that may affect actual results.

In September's press release, Monsanto reaffirmed "full-year 2009 ongoing

earnings per share (EPS) at the low end of its previously-announced range of $4.40

to $4.50."  The press release states that "[g]ross profit from Roundup and other

glyphosate-based herbicides is expected to be lower than anticipated, offset by an

expected slightly higher seeds and genomics gross profit, incremental selling,

general and administrative savings, and a lower tax rate."  For these reasons,

"Monsanto expects ongoing EPS in the range of $3.10 to $3.30 for fiscal year 2010

. . . ."  The press release also announces Casale's intention to "re-emphasize the

company's commitment to more than doubling gross profit in fiscal year 2012 over

its fiscal year 2007, with seeds and genomics making up 85 percent of the total

gross profit mix by that time."  However, gross profit from Roundup/glyphosate in

2010 was predicted only in the range of $650 million to $750 million.  Monsanto

projected net branded average selling price for Roundup/glyphosate of $10-$12 per

gallon, down from over $20 in fiscal 2009.  The press release contains the

following statement from Casale:

We are now managing our way through a competitive spike in the

> supply of generic glyphosate.  The financial effect for us has been that
> we are now targeting to optimize the gross profit from Roundup and
> other glyphosate-based products at $1 billion annually.  While we can
> see a path to the $1 billion target in 2012, there are multiple
> headwinds causing us to forecast below that mark in the next two
> years . . . In short, our growth as a company will not be driven by the
> 15 percent of the business that will be the agricultural productivity
> segment, but by that 85 percent that will be seeds and genomics . . .
> Said another way, the 20 percent compound annual growth rate for
> seeds and genomics from 2007 to 2012 is tied to the most critical and
> sophisticated choice the growers make each year, and the one that
> they will value above any other input.  Our growth is tied to the things
> we can control: the pace of innovation and the speed to market.

The release concludes with a warning regarding forward-looking statements that is

substantially similar to those found in previous Monsanto press releases.

During the investor call held the same day, Casale[26] explained how

Monsanto intended to "optimize the gross profit from Roundup":

> On the glyphosate side of the business, we had steady to rising
> demand, but we had a shortage of supply particularly from out largest
> competitor, which is the manufacturers in China, that causes prices to
> rise dramatically.  That incented a tremendous amount of Chinese
> production, capacity expansion.  Market got oversupplied.  Price
> dropped dramatically to the point now where as we sit here today,
> there's probably about four times as much in the inventory of generic
> glyphosate in the United States as there was a year ago at this point in
> time.  So given that we're in that business with Roundup, there is an
> issue that we had to deal with going forward.

---

[26]Casale began his presentation by noting that he would be making forward-looking statements and directing the participants to the cautionary language regarding forward-looking statements that appeared at the end of the presentation and in the press release.  This language is substantially similar to the safe-harbor language used by Monsanto in previous conference calls, press releases, and Form 10-Qs.

And so what we're going to do and what we have done is we announced new pricing in the United States yesterday.  We will throughout the rest of the world where we've repriced this business to be competitive with the generic offering longer term.  And our view is that for 2010, the gross profit contribution from Roundup is going to be in the $650 million to $750 million range.

In addition to that, in net of that, we're going to offer on a one-time basis in the US about 100 – well, worldwide, about $100 million, $150 million of price incentives to our customers to basically incent the purchase in 2010 of our product to reestablish our brand position.

As we move to 2011, that $100 million to $150 million will flow back into GP because we won't be offering it again.  And in addition, we'll get that leverage from additional volume utilization.  We have more capacity coming on stream.  We've also identified about another $70 million to $100 million in raw material cost savings, product consolidation that will hit the COGS side of the equation as well.

So bottom line between now and 2012, we see a path where we're going to be in the order of $650 million to $750 million for Roundup to basically optimize to get in the billion dollar range by 2012.

Well the impact of that, as we go forward, is obviously we're coming off of the bubble that we forecasted that would happen.  We're going to see obviously a decline in gross profit for next year . . . So stated another way, the strategy that we've put in place in very simple, it's very transparent, designed to deliver $1 billion of gross profit is predicated entirely on things we control – capacity utilization; additional cost savings; and basically maintaining a 60% of our volume mix in our brand, 40% in third party supply.  So in order to get there, it's just execution on our part in order to get there.  We have no assumptions in terms of seeing a higher price environment is because of what competitive set looks like going forward . . . So as we look at our overall business, while dealing with the challenges associated with the Roundup business, and as I said, we will, we are still on track to double our gross profit of this business by 2012, which we set out to do in 2007.

Casale concluded his presentation by stating that Monsanto was "very well poised

as we sit here today to see a doubling of this business from a GP standpoint in

2012, which was our target off of our 2007 base."  With respect to Monsanto's

Roundup Ready 2 Yield soybeans, Casale stated:

> We just had our first limited commercial release of our Roundup
> Ready 2 Yield soybeans in the US in 2009.  We'll begin to ramp those
> up in 2010.
>
> It is literally a game changing technology.  The reason why is our
> product concept is 7% to 11% more yield.  It's a higher yielding
> soybean, and it's by virtue of how we constructed the gene construct
> in the product.  Well the relevance of 7% to 11%, if you say the
> average yields were about 40 bushel per acre, that's four bushel.
> Average rate of historic gain through plant breeding has been about
> 0.4 of one bushel per year.  Four divided by 0.4 is 10.
>
> We will advance plant breeding by a decade through the launch of this
> product.  This is a big, big deal.  $10 a bushel of beans, 4 bushels,
> $40.  Not coincidentally, we charge about $20 more for the product
> over our existing product.  We got $20, farmer got $20; it's a pretty
> good deal, and allows us to have margin lift on our entire base as we
> ramp up.  So by creating a more valuable product for farmers, we can
> in fact share with them.

In response to a participant's question about the price of glyphosate, Casale

responded that Monsanto was "resetting prices as we speak.  And on a global basis,

as my slide showed, the long term being that $11 to $13 range, and that would

correlate to a generic price right now on the order of, say, $10.  So we've tested it

aggressively, and basically at these price premiums, these modest price premiums,

- 52 -

the brand is positioned very well."

At an investor conference held September 15, 2009, Grant reiterated that, "despite the correction or the reset in our guidance for 2010, . . . [Monsanto] ha[s] the capacity to double gross profit in our overall business from 2007 to 2012." Grant made the following comments about Roundup:

> As I mentioned in Roundup, in the longer term, by 2012, we are still targeting somewhere in the region of $1 billion and — next year or this year, this coming year, we think Roundup will do $650 million to $750 million.
>
> And it really faces three large headwinds, which was the reason for dampening the near term.  And the three headwinds are: one, enormous levels of competitive inventory, so competitive inventory, not ours, mainly Chinese generics, that has to be worked through.  The second one is, we are not fully leveraging our cost of goods position as we bring on new capacity in the early part of calendar year 2010.

Grant concluded his presentation by stating that, "by 2012, we will have $7.33 billion to $7.5 billion of gross profit in our seeds franchise, and we get there by serving the grower worldwide . . . and that's what makes us unique and that's what makes us confident in the future for this business."[27]

<u>Plaintiff's Allegations That These Statements Were False and/or Misleading</u>

---

[27]Grant's presentation included the standard safe-harbor language, as well as a document stating that "Monsanto remains on track to more than double 2007 gross profit in 2012 with a 20 percent CAGR [compound annual growth rate] in seeds & genomics."  Grant's written materials also indicated that "factors in Monsanto's control - volumes and costs - drive [Monsanto's] ability to meet [its] 2012 target for Roundup."

Plaintiff alleges that by the third quarter of 2009, when Monsanto announced the creation of a separate division for the herbicide business, Monsanto was already "well aware of the negative trend in Monsanto's herbicide business, a fact [it] never disclosed."  As evidence of this, plaintiff alleges that in June defendant Crews told CI 3 "that Monsanto's leadership had known about the Roundup inventory build-up and declining sales 'for awhile.'"   According to CI 3, Crews said that "we know and are doing everything we can to get things going again" and "Monsanto's leadership has been looking into it for a while."  Plaintiff alleges that demand was so weak for glyphosate that defendants "began offering millions of dollars in incentives to Monsanto's customers to buy its glyphosate-based products during fiscal 2009."  CI 3 allegedly attended a national sales meeting headed by several Monsanto executives of Monsanto where glyphosate sales representatives were told of "new sales incentives through which . . . customers could purchase glyphosate and would not have to pay for it until as late as June 2010."  According to CI 3, "Monsanto glyphosate sales representatives were told to capture customer tanks for fiscal 2010 business now so that Monsanto could book the sales in fiscal 2009."[28]   Plaintiff alleges that defendants falsely reported that the glyphosate sales

---

[28]Plaintiff claims that these the same sales activities forced Monsanto to restate its financial statements and disclosures for the fiscal years 2009 and 2010.  Because the amendment restates the Form 10-K for the fourth quarter fiscal year 2009, I discuss it in more detail there.

incentives would only apply to fiscal year 2010, and that "out of the $100-150

million allocated for the incentive program for the full fiscal year 2010, up to 45%

had already been used in the fourth quarter of 2009."[29]

Plaintiff also alleges that defendants knew that the 2010 targets for Roundup

were "false and materially inflated" because Confidential Informant 8, an

operations manager at Monsanto, claims that Monsanto executives were being

"bombarded" with concerns from glyphosate sales representatives that its sales

projections for glyphosate were "totally unrealistic."

Plaintiff also alleges that Monsanto's statements about its seeds and traits

business during this quarter were false and misleading because "defendants failed

to disclose that the launch of Monsanto's new Roundup Ready 2 Yield soybeans

on the 1.4 to 1.5 million acres was a failure because defendants could not sell the

new seeds at premium prices."  According to the amended complaint, "[i]n fact,

sales were so poor that Monsanto's retailers materially discounted the price

Roundup Ready 2 Yield to prices near those for Roundup Ready 1 seeds."

Plaintiff alleges that Monsanto's seeds and traits business was experiencing

"serious hardships of its own" because Roundup Ready 2 Yield was offered only in

---

[29]Plaintiff's allegations about the third and fourth quarters overlap substantially when discussing sales incentives.  I include this allegation here because plaintiff contends that it demonstrates that Casale's September announcement about the price incentives was false and misleading.

limited varieties and its ability to improve yield was "unproven to farmers."[30]

Plaintiff alleges that Monsanto began to force customers to switch from Roundup

Ready 1 seeds to Roundup Ready 2 Yield by refusing to renew licensing

agreements for Roundup Ready 1 and bundling Roundup Ready 2 Yield with other

seed treatments.  According to the second amended complaint, bundling the seed

treatments drove up the cost of Roundup Ready 2 Yield seeds, which were initially

priced at $20 more than Roundup Ready 1 in 2009.[31]  Monsanto allegedly justified

a price increase of more than 40 percent "due to purported added value with

technological improvements to the seeds, higher yields and greater efficiencies."

Yet plaintiff contends that "Roundup Ready 2 Yield was expensive, unproven and

was limited to varieties that could only successfully be grown in certain limited

parts of the country, materially limiting demand for the new seeds."[32]  Plaintiff

alleges that "farmers were not willing to purchase a higher priced, untested seed

---

[30]Plaintiff alleges that Confidential Informant 9, the president of an independent seed company that licensed and sold Monsanto soy and corn seeds, "confirmed" that Monsanto's trial roll-out of Roundup Ready 2 Yield was "a major disappointment."  The second amended complaint alleges that "according to CI 9, the demand for Roundup Ready 2 Yield was so low that Monsanto retail partners (Asgrow and Dekalb) materially cut the price of the new seeds so much that they were selling Roundup Ready 2 Yield at the same price as Roundup Ready 1."

[31]Plaintiff cites CI 9, Confidential Informant 10 (a seller of Monsanto soybean seeds at an independent seeds company), and allegations found in Monsanto Co., et al., v. E.I. DuPont Nemours and Co., et al., Cause Number 4:09CV686, currently pending in this district before the Honorable E. Richard Webber as evidence of these claims.

[32]Plaintiff credits CI 10 as the source of this information.

and, as of late 2009, farmers continued to be hesitant about purchasing Roundup

Ready 2 Yield."  Plaintiff claims that it was for this reason that farmers bought

only enough Roundup Ready 2 Yield soybeans to plant six million acres, instead of

the eight to 10 million acres expected by Monsanto.

    Plaintiff also alleges that the lack of demand in Roundup negatively affected

sales of Monsanto's seeds.  The second amended complaint alleges that

"[a]ccording to CI 1 and CI 2 starting in early 2009, as Monsanto lost material

market share in glyphosate to competitors like Dow and Syngenta, it also lost

market share in the seeds and traits business."  CI 5 claims that "customer demand

for Monsanto's soybean and corn seed products 'dramatically declined,' which,

based on conversations with customers, CI 5 attributed to price increases for

glyphosate that occurred in mid-2008."  CI 5 allegedly relayed the farmers'

concerns about "being burned" by Monsanto "to a Roundup Marketing Manager

and a Marketing Lead" and was told that "the sales problems were national and

that Monsanto's corporate office was aware of the trend."  CI 5 claims that he

heard "a lot of turbulent messages" from farmers about Roundup, "which made

them now second-guess who they would be buying their seeds from."  The second

amended complaint also alleges that Monsanto lost seeds and traits business to

Dow and Syngenta because those companies sold more products and varieties.[33]

Analysis

Once again, most of the statements plaintiff claims are false and misleading are actually forward-looking and protected by the safe harbor provision of the Exchange Act for the reasons discussed above.  These statements include: predictions of gross profit (including predictions of doubling gross profit and being "on track" to do so),[34] as well as gross profit for Roundup (including predictions that it "will continue to generate a strong source of cash and gross profit") and the seeds and traits business, along with the underlying assumption that seeds and traits would deliver higher-than-expected gross profit; predicted selling prices for Roundup, including the statement that "at these price premiums, the brand is positioned well;" predicted sales volume and market penetration for Roundup Ready 2 Yield soybeans,  along with the underlying assumptions that these predictions would be reached because of expected yield increases and price premiums; predicted guidance numbers; and statements of plans and objectives for future operations, including the plans to introduce new pricing and incentives for the future growing seasons, along with the assumption that these pricing changes

---

[33]The second amended complaint credits CI 1 and CI 2 as the source of this information.

[34]Predictions of a company being "on track" or "well positioned" are also inactionable puffery.  See Panera,697 F. Supp. 2d at 1095.

and incentives would generate increase sales.

As with the forward-looking statements in earlier quarters, these forward-looking statements were also accompanied by meaningful cautionary language.  In addition to the specific, detailed risks set out in the press releases, the written materials accompanying investor conferences, and the Form 10-Q, the defendants warned of these same risks repeatedly.  For example, the June 24 press release disclosed "increased pressure from generic glyphosate," which Casale explained meant that Monsanto "[is] facing a changing supply environment, and what we need to determine is the price, volume, [and] share dynamic that will deliver the optimal gross profit and ultimately the optimal level of operating cash.  This may entail stretched premiums and lower volumes, or at the other end of the spectrum, sub-historic premiums and a recapture of share and volume."  At the September 10 investor conference, Casale acknowledged that due to a "tremendous amount of Chinese production," there was "probably about four times as much in the inventory of generic glyphosate" in the U.S. market as compared to a year ago and that glyphosate prices had "dropped dramatically."  He added that, in response to these market conditions, Monsanto announced new pricing and incentives to compete with generic glyphosate.  Similarly, at a September 15 conference Grant cautioned that Roundup still faced "large headwinds," including "enormous levels

- 59 -

of competitive inventory . . . mainly Chinese generics, that has to be worked through."   As for Monsanto's prediction that the use of glyphosate sales incentives would generate additional revenue, Monsanto previously disclosed its practice of using incentive programs to drive sales and specifically and repeatedly warned investors that its ability to realize cash and gross profits would "depend on [its] ability to control . . . marketing costs without adversely affecting sales . . . and provide marketing programs meeting the needs of [its] customers."  Because the identified risks were detailed and specific to Monsanto's business and the changing conditions of the marketplace, defendants' forward-looking statements were accompanied by meaningful cautionary language and protected by the safe harbor provision of the Act.

Moreover, there is no evidence of falsity with respect to the statements concerning glyphosate sales incentives because there are no allegations to suggest that at the time the statements were made, Monsanto was actually using those sales incentives to bolster 2009 sales or that defendants thought that the incentives might not work.[35]  The same is true with respect to the statements about Monsanto's seeds

---

[35]Any claim based on a failure to disclose this information cannot survive because it is undisputed that Monsanto did, in fact, disclose these sales incentives.  To the extent plaintiff attempts to argue that disclosure was required before September 10, 2009, that claim would also fail because plaintiff has not alleged that any of defendants' statements were somehow rendered misleading as a result.  As discussed above, Monsanto had already disclosed on numerous occasions its use of sales incentives as a risk factor, and when combined with the warnings about

and traits business.  Plaintiff has pleaded no specific facts to suggest that Monsanto would have been unable to achieve its forecasts for seeds and traits even if, as plaintiff alleges, Monsanto was experiencing setbacks with the launch of Roundup Ready 2 Yield.  Indeed, gross profit for seeds and traits in the third quarter of 2009 was 17% higher than the third quarter 2008 gross profit, and soybean gross profit for the quarter was up 26% over the prior year's quarter on a 21% increase in sales.

Plaintiff also challenges the statement in the June 24 press release reporting "increased revenues from seeds and traits products," "estimat[ing] that some 16,000-plus farmers are using the Genuity brand Roundup Ready 2 Yield trait on approximately 1.4 million to 1.5 million acres this season."  Yet plaintiff does not allege that these estimates were false or that customer demand did not contribute to share gains.  Although plaintiff complains that the Roundup Ready 2 Yield was "a failure because defendants could not sell the new seeds at premium prices," there is no evidence of falsity because the challenged statements make no representations about price.[36]

---

the excess glyphosate inventory and "changing supply environment," earlier disclosure was not required to make Monsanto's statements not misleading.  "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." In re K-Tel International Securities Litig., 300 F.3d 881, 891 (8th Cir. 2002) (internal quotation marks and citation omitted).

[36]Plaintiff also offers no facts demonstrating that the price at which Roundup Ready 2 Yield was actually sold was not a "premium" price, even if it was still discounted.

Casale's statement that Roundup Ready 2 Yield is "literally a game changing technology" is not, as plaintiff argues, a present statement of verifiable fact.  It is inactionable puffery, as are his statements about Roundup being "positioned very well."  See In re NVE Corp. Securities Litig., 551 F. Supp. 2d 871, 895-96 (D. Minn. 2007) (statements calling technology "the Holy Grail of memory" and "the type of technology that occurs once in a lifetime are puffery), aff'd, 527 F.3d 749 (8th Cir. 2008); Hutchinson, 536 F.3d at 960 ("[w]e believe we are well-positioned on a number of new disk drive programs" is puffery).  My review of the record reveals no actionable statements for the third quarter of fiscal year 2009.

**D.**     **Fourth Quarter Fiscal Year 2009**

<u>Defendants' Statements</u>

On October 7, 2009, Monsanto reported ongoing EPS for fiscal 2009 of $4.41 and "affirmed its full-year ongoing 2010 EPS is in the range of $3.10 to $3.30."  It also "reported net sales of $1.9 billion for the fourth quarter of fiscal year 2009, a slight decrease over the same period of fiscal year 2008 due in large part to a sales decrease for Monsanto's Roundup and other glyphosate-based herbicides as a result of pricing competition and a global glyphosate supply and demand imbalance."  However, Monsanto also announced that "positive drivers for

- 62 -

the quarter included higher sales of corn seeds and traits as well as sales of vegetable seeds," and  "seeds and traits, which is targeted to account for 85 percent of Monsanto's business in 2012, is expected to cross the $5 billion gross profit mark for the first time in 2010 by creating new value for growers and increasing their profitability on farm."  The press release reports quarterly net sales of Roundup at $778 million and states that "Monsanto delivered on its commitment to grow ongoing earnings per share (EPS), reporting at year-over-year increase of 21 percent to $4.41 per share (5 percent or $3.80 on an as-reported basis), driven by strong seeds and traits performance, the optimization of gross profit for Roundup and other glyphosate-based herbicides at $1.8 billion, and extraordinary cost reduction actions." [37]

   During a conference call held the same day,[38]  Casale (who by this time had

---

   [37]The October 7, 2009 press release contains substantially the same cautionary language regarding forward-looking statements as included in the previous press releases, Form 10-Qs, and other materials set out above.

   [38]The conference call began with the following statement by a Monsanto executive:

   I need to remind you that this call will include statements concerning future events and financial results.  Because these statements are based on assumptions and factors that involve risk and uncertainty, the Company's actual performance and results may vary in a material way from those expressed or implied in any forward-looking statements.  A description of the factors that may cause such a variance is included in the Safe Harbor language contained in our most recent 10-Q and in today's press release.

Monsanto's standard safe-harbor language was also included in materials accompanying the presentation.

replaced Crews as CFO) announced that Monsanto intended to increase grower

profitability by launching Roundup Ready 2 Yield and SmartStax "at levels

unprecedented in our history and thus in our industry."  Casale warned that these

new launches came "with a cost" and "don't immediately translate into share

shifts," so he anticipated a "break even or even [] a modest loss in the first quarter

and a small loss in the fourth" as the Seeds and Genomics growth rate would drop

in 2010 to 13 to 15 percent.  During the same call, Grant said that "if [Monsanto]

provide[s] the compelling returns that we believe these two technologies promise,

we can see a path to servicing some 65% to 75% of the market opportunity with

these traits in our brands, and our brands through our licensees in 2012."  Grant

concluded his presentation by stating that "we remain on track to deliver on our

commitment to more than double the gross profit that we delivered in 2007."

However, he acknowledged that this "was an aggressive commitment," especially

"given the volatility on Roundup that's being managed across the life of this five-

year plan."  When asked how farmers have reacted to the price cut of Roundup,

Casale responded that "it's being received well, but the season's just getting

going."  On the same call, another executive reaffirmed Monsanto's "clear path to

optimizing Roundup gross profit at the $1 billion target by 2012 . . . ."

Monsanto filed its 10-K on October 27, 2009.  The section entitled

"Outlook" states in relevant part as follows:

> We have achieved an industry-leading position in the areas in which we compete in both of our business segments.  However, the outlook for each part of our business is quite different.  In the Seeds and Genomics segment, our seeds and traits business is expected to expand.  In the Agricultural Productivity segment, our glyphosate business has grown through increases in our average net selling prices in 2008 and 2009, however prices have declined in fiscal year 2010 and are expected to remain lower than in 2008 and 2009.  In 2009, our glyphosate volumes declined due to share loss resulting from declining competitive prices and increasing competitive supply, as well as from the effect of the drought in South America.  Our selective chemistry business is expected to decline.  As a result, we are working to rebuild a competitive position in our chemistry business, while we strive to expand our business in seeds and traits via our investment in new products.

> We believe that our company is positioned to deliver value added products to growers enabling us to double 2007 gross profit by 2012.  In the short term, we expect volatility in the Roundup business as it moves to a sustainable level of earnings.

> . . .

> Our capabilities in plant breeding and biotechnology research are generating a rich and balanced product pipeline that we expect will drive long-term growth.  We plan to continue to invest in the areas of seeds, genomics and biotechnology and to invest in technology arrangements that have the potential to increase the efficiency and effectiveness of our R&D efforts.  We believe that our seeds and traits businesses will have significant near-term growth opportunities through a combination of improved breeding and continued growth of stacked and second-generation biotech traits.

> . . .

> We believe our Roundup herbicide gross profit peaked in 2008, and

will decline in 2010 in light of our announced U.S. price reduction
and global oversupply of low generic material.  However, we believe
the business will continue to generate a strong source of cash and
gross profit.  Prices of generic formulations of glyphosate herbicides
increased during fiscal year 2008, but against a backdrop of increased
global supply and softening raw material prices, generic prices are not
at or near historical lows in many of our key markets.  We have
experienced fluctuating demand in recent years, and we are increasing
production capacity at our Luling, Louisiana plant to meet the
anticipated future demand for Roundup.  We will continue to actively
manage our inventory and other costs.

The Form 10-K also contains the following section entitled "Caution Regarding

Forward-Looking Statements":

In this report, and from time to time throughout the year, we share our
expectations for our company's future performance.  These forward-
looking statements include statements about our business plans; the
potential development, regulatory approval, and public acceptance of
our products; our expected financial performance, including sales
performance, and the anticipated effect of our strategic actions; the
anticipated benefits of recent acquisitions; the outcome of
contingencies, such as litigation; domestic or international economic,
political and market conditions; and other factors that could affect our
future results or operations or financial position . . . . Any statements
we make that are not matters of current reportage or historical fact
should be considered forward-looking.  Such statements often include
words such as "believe," "expect," "anticipate," "intend," "plan,"
"estimate," "will," and similar expressions.  By their nature, these
types of statements are uncertain and are not guarantees of our future
performance.

Our forward-looking statements represent our estimates and
expectations at the time that we make them.  However, circumstances
change constantly, often unpredictably, and investors should not place
undue reliance on these statements.  Many events beyond our control
will determine whether our expectations will be realized.  We disclaim

- 66 -

any current intention or obligation to revise or update any forward-looking statements, or the factors that may affect their realization, whether in light of new information, future events, or otherwise, and investors should not rely on us to do so.  In the interests of our investors, and in accordance with the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, Part I, Item 1A. Risk Factors below explains some of the important reasons that actual results may be materially different from those that we anticipate.

Item 1A. contains the following Risk Factors and accompanying explanations:

*Competition in seeds and traits and agricultural chemicals has significantly affected, and will continue to affect, our sales.*

Many companies engage in plant biotechnology and breeding research and agricultural chemicals, and speed in getting a new product to market can be a significant competitive advantage.  Our competitors' success could render our existing products less competitive, resulting in reduced sales compared to our expectations or past results.  We expect to see increasing competition from agricultural biotechnology firms and from major agrichemical, seed and food companies.  We also expect to face continued competition for our Roundup herbicides and selective herbicides product lines.  The extent to which we can realize cash and gross profit from these products will depend on our ability to: control manufacturing and marketing costs without adversely affecting sales; predict and respond effectively to competitor pricing and marketing; provide marketing programs meeting the needs of our customers and of the farmers who are our end users; maintain an efficient distribution system; and develop new products with features attractive to our end users.

.  .  .

*Fluctuations in commodity prices can increase our costs and decrease our sales.*

We contract production with multiple growers at fair value and retain the seed in inventory until it is sold.  These purchases constitute a significant portion of the manufacturing costs for our seeds.

Additionally, our chemical manufacturing operations use chemical intermediates and energy, which are subject to increases in price as the costs of oil and natural gas increase . . . .

. . .

*Our ability to match our production to the level of product demanded by farmers or our licensed customers has a significant effect on our sales, costs, and growth potential.*

Farmers' decisions are affected by market, economic and weather conditions that are not known in advance. Failure to provide distributors with enough inventories of our products will reduce our current sales. However, product inventory levels at our distributors may reduce sales in future periods, as those distributor inventories are worked down. In addition, inadequate distributor liquidity could affect distributors' ability to pay for our products and, therefore, affect our sales or our ability to collect on our receivables. International glyphosate manufacturing capacity has increased in the past few years. The price of this glyphosate will impact the selling price and margin of Roundup brands and also on our third party sourcing business.

. . .

*Weather, natural disasters, and accidents may significantly affect our results of operations and financial condition.*

Weather conditions and natural disasters can affect the timing of planting and the acreage planted, as well as yields and commodity prices. In turn, the quality, cost and volumes of the seed that we are able to produce and sell will be affected, which will affect our sales and profitability. Natural disasters or industrial accidents could also affect our manufacturing facilities, or those of our major customers, which could affect our costs and our ability to meet supply. One of our major U.S. glyphosate manufacturing facilities is located in Luling, Louisiana, which is an area subject to risk from hurricanes. Hawaii, which is also subject to hurricanes, is a major seeds and traits location for our pipeline products.

- 68 -

After this case was filed, Monsanto disclosed that "the staff of the [SEC] is conducting an investigation regarding Monsanto's customer incentive programs relating to its glyphosate products in fiscal years 2009 and 2010, and Monsanto has received a subpoena for documents in connection therewith."  On October 5, 2011, Monsanto filed a report with the SEC on Form 8-K that provided an update on the SEC's investigation and disclosed that it had undertaken its own internal review and audit of the situation.  On November 14, 2011, Monsanto filed an amended Form 10-K, which the parties refer to as "the Restatement."[39]  The Restatement restates Monsanto's financial statements and disclosures for the fiscal year ended August 31, 2009.  Monsanto determined that a restatement was necessary because its internal investigation revealed "communications with customers . . . and other facts . . . that impacted our determination of which revenue transactions resulted in progress by the customer toward earning the program incentive."  Monsanto explained the need for the Restatement as follows:

> Specifically, Monsanto implemented a program in the first quarter of fiscal year 2010 that was structured to provide payments to retailers who met sales volume targets and performed other marketing and sales activities in the fiscal year 2010 with the amount of the program incentive determined based on the amount of inventory maintained by the customer at August 31, 2009.  We originally accrued the costs of

---

[39]Plaintiff's request to have me consider the Restatement led to the filing of the second amended complaint.

this incentive program based on the retailers' fiscal year 2010 purchases as a percentage of aggregated agreed upon fiscal year 2010 sales volume targets.  As a result of our internal review, Monsanto determined that, although the program was implemented in first quarter fiscal year 2010, Monsanto representatives communicated with retailers about the program in the fourth quarter of fiscal year 2009, including advising customers that purchasing product in the fourth quarter of 2009 was a qualification for participation in the program in fiscal year 2010.  These communications were intended to induce customers to purchase branded glyphosate in the fourth quarter of fiscal year 2009.  In light of these facts, Monsanto determined that purchases made by these retail customers to purchase branded glyphosate in the fourth quarter of fiscal year 2009 represented progress toward earning the program incentive.  As such, it is appropriate to record a portion of the related incentive cost as a reduction in revenue in that quarter as well as in fiscal year 2010.  As a result of our determination, approximately $24 million of customer incentive accruals associated with the program originally recorded as a reduction of revenue in third quarter fiscal year 2010 were recorded as a reduction of revenue in fiscal year 2009.

Additionally, Monsanto maintained an incentive program related to annual incentive agreements with distributors regarding their sales of branded glyphosate.  At the end of fiscal year 2009, Monsanto determined not to make annual incentive payments under this program to seven of our distributors who had failed to meet their agreed upon sales targets for branded glyphosate and reversed incentive accruals previously recorded under this program for these customers.  We then provided these distributors with an opportunity to earn back a substantial portion of these incentives in fiscal year 2010 by achieving volume targets for branded glyphosate and performing other marketing and sales activities in that fiscal year.  Monsanto originally recorded the costs of this program over these distributors' fiscal year 2010 purchases as a percentage of aggregated agreed upon fiscal year 2010 sales volume targets.  As a result of our internal review, we determined that, although this program was formally announced in the fist quarter of fiscal year 2010, Monsanto representatives communicated with distributors about the program in the fourth

quarter of fiscal year 2009, and that the incentive opportunity ultimately provided to each distributor under this program in fiscal year 2010 was derived from each distributor's total sales of branded glyphosate in fiscal year 2009.  In light of these facts, Monsanto determined that purchases made by these customers in fiscal years 2009 and 2010 represented progress toward earning the program incentive.  As such, we determined that the appropriate method of recording the cost associated with this program is based upon each distributor's purchase volume over the period of fiscal years 2009 and 2010, with a reduction of revenue in fiscal year 2009 originally recorded as a reduction in revenue in fiscal year 2010.  In addition, Monsanto's internal review revealed that, during the second quarter of fiscal year 2010, one of the seven distributors received written confirmation from Monsanto that it had fulfilled the requirements of this program.  Accordingly, we determined that it was appropriate to record the full amount of this distributor's incentive under this program originally recorded as a reduction in revenue in third quarter fiscal year 2010 were recorded as a reduction of revenue in second quarter fiscal year 2010.

A similar earn back program was offered to two distributors in fiscal year 2011.  At the end of the fiscal year 2010, Monsanto reversed customer incentive accruals for two distributors that failed to earn their fiscal year 2010 annual incentive payments because they did not meet their agreed upon sales targets.  We then provided these distributors with an opportunity to earn back a substantial portion of this incentive in fiscal year 2011 by achieving agreed upon sales volume targets for branded glyphosate and performing other marketing and sales activities in fiscal year 2011.  We originally accrued the costs of this incentive program over these distributors' fiscal year 2011 purchases as a percentage of agreed upon fiscal year 2011 sales volume targets.  As a result of our internal review, Monsanto determined that purchases made by the customers in fiscal year 2010 represented progress toward earning the program incentive, and that it was appropriate to record the entire cost associated with this incentive program in fiscal year 2010 in view of several factors that made it more apparent that the two distributor customers had earned these incentives in fiscal year 2010.  Such factors included the

change in market dynamics following our May 2010 restructuring of our glyphosate business, the fact that both distributors received written confirmation from Monsanto in the second quarter of fiscal 2011 that they had fulfilled the requirements of this program prior to achieving sales volume targets and, with respect to the prepayment of program incentives to these customers in the first and second quarters of fiscal year 2011, the unlikelihood that Monsanto would have enforced its contractual right of offset against these distributors with respect to any unearned portion of their incentives.  As a result of our determination, approximately $48 million of customer incentive accruals associated with this program originally recorded as a reduction in fiscal year 2011 were recorded as a reduction in revenue in fiscal year 2010.

Plaintiff alleges that, according to the Restatement, "defendants caused Monsanto to fail to record $44 million in costs relating to glyphosate sales incentives to its customers during the quarter ended August 31, 2009," which overstated Monsanto's actual ongoing EPS by $0.03 for the quarter and year ended August 31, 2009.[40]

In a press release dated November 10, 2009, Monsanto stated that it "expects total-company gross profit in 2012 in the range of $8.6 billion to $8.8 billion, with

---

[40]Plaintiff makes clear in its opposition to dismissal that it is not alleging accounting fraud based on the Restatement; rather, plaintiff claims that the "conduct that caused defendants to restate Monsanto's fiscal 2009 financials" supports their underlying claims that defendants made false and misleading statements about Monsanto's Roundup business.  Because there is no claim being made based on the amended Form 10-K itself, I will not describe it in detail.  Suffice it to say, like all of Monsanto's other public filings, the amended Form 10-K also contains the standard cautionary language regarding forward-looking statements, along with a detailed explanation of the risk factors that may cause the company's actual results to vary materially from the predicted ones.

gross-profit contribution from its Seeds and Genomics platform representing $7.3 billion to $7.5 billion of the 2012 target."  During a November 10 investor event,[41] Monsanto again stated that it remained "on track" to double gross profits from 2007 to 2012.  Grant acknowledged that the key to meeting this forecast was the seeds and traits business.  He then stated that "the elephant in the room is can Monsanto deliver on 2010?  Can Monsanto deliver on 2011?  Can they really double by '12?"  He answered these questions with a "yes."  Grant also told investors that the key to doubling gross profits by 2012 "is [the] mix [of new technologies available to farmers]," which included making Roundup Ready 2 Yield soybean and SmartStax corn seeds readily available for sale a year earlier than expected.   However, Grant also noted that Monsanto was still "in an early introductory year" with these traits, "so relative to the overall business it's still quite small . . . ."

Defendant Brett Begemann, Executive Vice-President of Seeds and Traits, made the following comments about Monsanto's Roundup Ready 2 Yield soybeans:

Now, let's talk soybeans and Roundup Ready 2 Yield.  I talked about the exciting news when . . . they said, hey, you won't believe it, but

_____

[41]This investor event began like the others, with a warning that "we will be making some forward-looking statements."

I've got two pieces of good news for you.  We are now confident that we can supply 8 million to 10 million acres of Roundup Ready 2 Yield this year versus our previous estimates.  8 million to 10 million acres of Roundup Ready 2 Yield is another opportunity for us to help our farmer customers increase their profitability and in turn buy more of our stuff.

Now . . . there's lots of noise out there . . . there are some farmers out there that don't enjoy the experience that we would like for them to experience in the first year of launch . . . We didn't have enough variety to get to everybody with multiple varieties on their farm . . . There is no doubt in my mind that farmers are going to have a great experience with Roundup Ready 2 Yield.  And that is not to minimize the unfortunate consequence of some of them not experiencing that this year.  But that's normal when you're selling yields.  And that's the difference with Roundup Ready 2 Yield.  It's not bug and weed control.  You don't get the yield results every year like you get bug and weed control results every year . . . And yet even at $6.00 or $7.00 commodity prices, Roundup Ready 2 Yield makes sense.  Does it meet what we're hoping our farmers will experience.  Well, no.  But it's still a positive return for farmers because of the significant yield increase.

There's no doubt in my mind, as we have farmers experienced with Roundup Ready 2 Yield, we will move to where we need to be with unconstrained supply by 2012, to deliver that piece from soybeans.  And as I look at how our orders are going for our soybean business, as I commented on corn, I feel good.  Our customers are having a rough year.  It's not been good for harvest.  But they're doing well and they're ordering their seeds and we feel good about where those orders stack up.

Begemann attributed the "rough year" to weather conditions -- the "wettest fall in 120 years" and "the coldest July on record" -- which delayed seed purchases for the next growing season.  Begemann also echoed Grant's statements "that the total

volumes of SmartStax and Roundup Ready 2 Yield are not huge," but he still believed Monsanto was "on pace" with "both of those new game-changing technologies."

Casale spoke to investors about Roundup.  He stated:

And if you think back to 2007, when we actually set out on this plan, a couple of things strike me.  First of all, in 2010, we would have predicted or modeled our EPS on the order of about $3.50 per share.

But embedded in that $3.50 was the expectation that Roundup would be delivering approximately $1.2 billion of gross profit.  Our current expectations for 2010, our gross profit in the $650 million to $750 million.  So we're essentially on track with out plan, with about half the contribution from our Roundup business, which tells me and signals me, just how strong our seeds and traits franchise is.

The second point that I'd like to make is the reinvestment of the Roundup windfall.  At its peak, it was generating approximately over $1 billion more than what we anticipated this year, but what we did from 2007 into 2009 is took that money and invested it in higher margin seed businesses . . .

. . .

Now, I want to focus on the future, but I also want to touch on 2010 as well.  And the first thing I'd like to do is reconfirm our guidance in the $3.10 to $3.30 per share as well as free cash in the 900 million to $1 billion range for the year.

There's a couple of other points I'd like to make about how the year is going to unfold.  And the first is, it's just the sequence and timing of earnings throughout the year.  With the Roundup reset, what we're going to see is, is more of a return to a historic pattern of earnings, which is basically break even to a slight loss in the first quarter, virtually 100% of our business done in the second and third quarters, roughly split to 50-50 to perhaps 60-40, second/third, and returning to

- 75 -

a loss again in the fourth quarter.

. . .

So we don't see it as indicative of how the year is going to unfold, but the change is based upon three things.  First of all, as you'll recall, last year in the first quarter we had a very strong Roundup quarter in Latin America, with the reset on Roundup and a lowering of our price, we're not going to have the operational benefit of that as we looked in 2010.

. . .

Now Roundup's not going to contribute to the gross profit increase in the business as we progress towards 2012, but given the significant changes that we've made in that business, I did want to touch on it a little bit in terms of how we're operationalizing the plan.

And really the plan is actually quite simple.  It's decrease selling price, increase volume, take direct costs out of the business and run the business forward with discipline.  And so the generation or the result of that is moving from 180 million gallons of volume in 2009 to approximately 250 million gallons in 2010, timed to reduce selling price, should generate on the order of $650 million to $750 million of gross profit.

And as we look from '10 to 2012, where we see the business stabilizing at approximately $1 billion of gross profit, then that plan or that increase is predicated on things that are in our control.  We're making no assumption in terms of competitive price increase over that time horizon.

And the delta, or the bridge, between where we're at today in the $1 billion is a function of three things.  Obviously, we're going to be selling more volume in 2012 as our additional capacity [of blowing] comes fully on stream.  We're going to benefit from reduced costs, both at the cost of goods standpoint, because we're going to have additional raw material leverage, as well as the dilution effect that

comes along with being able to sell more volume. And we're also going to recover about $150 million of one-time price incentives that we've offered to the marketplace in 2010 that will flow back to us in 2011.

So we have a plan that we believe is achievable. And again, we've focused the plan on events that are in our control. It's really early within the selling season, but the structural changes that we've implemented are basically all in place.

The only other point that I would make is from a customer standpoint, we're getting a strong, strong level of support from our customers. They buy into the strategy because they realize that, albeit at reduced selling prices, there is significant value that the Roundup brand can still bring to the marketplace to bring value to our ultimate customer, the farmer, but also creates additional profit opportunities for our distribution companies, who are our customers as well.

The second amended complaint alleges that on December 7, 2009, Monsanto filed

its 2009 Proxy with the Securities & Exchange Commission on Form 14/A, which

states that "we continue to focus on growing our seeds and traits business and our

commitment to double our company's gross profit by fiscal 2012, from our fiscal

2007 base. We believe the successful launch of next generation products by our

seeds and traits segment will be essential to meeting our growth commitment for

2012."

Begemann spoke again about Monsanto's goal of doubling gross profit at

another investor conference held in December:[42]

> Obviously today as I talk about our plans to 2012 and doubling of gross profit, I will be making some forward-looking statements, so please keep that in mind as I go forward today.
>
> One of the things that we laid out at our [November] conference was a recommitment, if you will, of doubling our gross profit by 2012 as a Company. We have had challenges over the last couple of years with the glyphosate business, etc. and what's going on there, but wanted to be very clear that we still have significant confidence in doubling our gross profit by 2012 and feel very strongly that we can do that. The great news from my perspective when I look at the operational plan is the products necessary to do that are in our hands. And more importantly, the products that we need to do that are in the customers' hands and they are touching them, feeling them, and using them today. And it's all about that mix shift that's going to occur in corn and soybeans in the United States and the acceleration of our traits in South America that is going to allow us as a Company to double our gross profit by 2012.
>
> And as you think about that bridge and as you think about how we get there, obviously a significant part of that comes from our seeds and traits business. Nearly $2.9 billion worth of that comes from our seeds and traits business and that is highly leveraged to corn, corn being the largest crop that we participate in as well as the most valuable crop for Monsanto. Nearly 75% of that incremental gross profit comes from corn.[43]

At an investor conference on December 8, 2009, Grant reiterated[44] that there was

---

[42]Begemann's remarks were accompanied by materials that included the standard Monsanto cautionary language regarding forward-looking statements.

[43]The accompanying materials includes a slide entitled "Corn and Soy Blockbuster Launches Drive Gross Profit Bridge to 2012."

[44]Grant's comments were accompanied by slides containing Monsanto's standard safe-harbor language.

"no change" to Monsanto's commitment to doubling gross profit by 2012 except

that they now had "more data yield that provides an additional level of granularity

against those milestones."  He also reported that farmers were experiencing a "7%

yield improvement on our Roundup Ready 2 Yield platform."  In response to a

question about "what risk factors are out there that wouldn't allow you to get to

[the 2012] targets," Grant responded:

> Real fast, the risk factors are executional; and that's why it's a long
> answer, but it deserves a long answer.  The risk factors for us — and
> it's the milestones and doubling — that they position, launch, and
> switch these platforms in the time available.
>
> And the other one would be regulatory.  But I made this presentation a
> year ago, and we were talking about the anticipation of approval of
> SmartStax.  I think that regulatory risk has reduced and the world has
> gotten bigger in the last 12 months.  So I actually see the regulatory
> framework as more favorable than it's been in a while.
>
> We just need to deliver on rolling these out and making sure the
> farmers get the yield results they anticipate.

Plaintiff's second amended complaint also alleges that Robb Fraley, Monsanto's

Chief Technology Officer, made the following statements at a December 8, 2009,

Yield Update Luncheon:[45]

> [I]n a challenging weather year without much stress, both our

---

[45]Plaintiff does not provide the transcript or citations for this conference call (or anything else), and defendants have also failed to include it as an exhibit in support of their motion to dismiss.  Therefore, I include these allegations because they are part of the second amended complaint, but I have not verified the accuracy of these attributed quotations.

> SmartStax, our Roundup Ready 2 Yield products and our core
> genetics delivered great performance . . . . Roundup Ready 2 Yield
> meets our requirements, and has delivered exceptional performance,
> which will only be strengthened as we look at the broader germplasm
> in the Class of '10 and '11.

Monsanto reiterated its confidence in its ability to reach its 2012 financial targets

in a December 8, 2009 press release.

<u>Plaintiff's Allegations That These Statements Were False and/or Misleading</u>

In addition to the facts previously discussed, plaintiff again alleges that

defendants' statements about Roundup and gross profit were false and misleading

because Monsanto was forced by poor sales to initiate an incentive program to sell

glyphosate-based products and that Monsanto used the incentive program to "pull

additional glyphosate sales into fiscal 2009 . . . When defendants belatedly

mentioned an incentive program on September 10, 2009, they represented that the

program would only apply to fiscal year 2010 and failed to inform investors that

out of $100-150 million allocated for the incentive program for the full fiscal year

2010, up to 45% had already been used in the fourth quarter of 2009."  In other

words, plaintiff claims that "defendants offered incentives to its distributors for

fiscal 2010 to cause them to purchase glyphosate in fiscal 2009" and did not tell

investors that Monsanto "used glyphosate sales incentives to pull additional

glyphosate sales into fiscal 2009."  Plaintiff alleges that as later revealed in the

Restatement, "defendants caused Monsanto to fail to record $44 million in costs relating to glyphosate sales incentives to its customers during the quarter ended August 31, 2009, thereby materially overstating Monsanto's Roundup/glyphosate gross profit by 16% for the quarter ended August 31, 2009 and overstating Monsanto's actual ongoing EPS by $0.03 for the quarter ended August 31, 2009." According to plaintiff, this allowed "defendants to continue to hide the true condition of the company's glyphosate business."

Plaintiff alleges that defendants' statements about Roundup Ready 2 Yield soybeans continued to be false and misleading for the reasons discussed above, namely, that sales were materially below expectations because the new seeds were too expensive, sold in limited varieties, and did produce the predicted yields.

In the fourth quarter of 2009, Monsanto announced the launch of its SmartStax corn product.  Yet plaintiff alleges that Monsanto experienced problems with its launch as well, and that demand for these seeds, like that for Roundup Ready 2 Yield, was far below expectations.   The second amended complaint alleges that "on October 8, 2009, it was disclosed that the United States Justice Department was investigating whether Monsanto violated antitrust rules in trying to expand its dominance of the market for genetically engineered crops." Monsanto allegedly then "began retreating from its seeds and traits pricing

strategy" in late October, and on October 26, 2009 it announced that it would be reducing pricing for its new corn seed product.   Plaintiff claims that "there was further evidence that farmers were reluctant to pay the premium prices for Monsanto's new soybeans and corn seeds" by November of 2009.[46]  As further evidence that Roundup Ready 2 Yield soybeans were "materially below expectations," plaintiff also points to a research report published by OTR Global in late October that reportedly revealed that yields were lower than predicted.[47]

Plaintiff claims that "by late 2009, Monsanto abandoned its efforts to force farmers to buy Roundup Ready 2 Yield and seed treatments."  CI 9 and CI 10 were allegedly told by Monsanto during this time period that it had decided to abandon the bundling of seed treatments to force the adoption of Roundup Ready 2 Yield and to allow farmers to continue to grow and sell Roundup Ready 1 soybeans (allegedly even after the technology patent expired and by permitting them to save seeds).

_____

[46]Plaintiff cites CI 10 as the source of this information, claiming that "CI 10 observed a material decline in demand in Roundup Ready 2 Yield soybeans.  On November 16, 2009, CI 10 informed Monsanto that CI 10 estimated to sell approximately 25,000 units (one unit equals 140,000 seeds) of Roundup Ready 2 Yield soybeans," but "by January 21, 2010, CI 10's projection of further sales was lowered to 7,500 units, a 70% decrease.  According to CI 10, in total only 5,000 unites were sold between November 2009 and April 2010."

[47]As plaintiff admits, Monsanto disputed this report as flawed because of the small sample size (20 farm managers and seed distributors in five states) and the fact that half of the crops had not yet been harvested.

<u>Analysis</u>

As with prior quarters, most of the statements plaintiff claims are false and misleading are actually forward-looking and protected by the safe harbor provision of the Act for the same reasons discussed above.  These statements include: predictions of gross profit (including predictions of doubling gross profit, having a "clear path" to optimizing gross profits, having "no change" to this commitment, and being "on track" to do so), as well as gross profit for Roundup and the seeds and traits business, along with the underlying assumption that seeds and traits would deliver higher-than-expected gross profit; predicted selling prices for Roundup; predicted sales volume and market penetration for Roundup Ready 2 Yield soybeans and SmartStax corn,  along with the underlying assumptions that these predictions would be reached because of expected yield increases and price premiums; predicted guidance numbers; and statements of plans and objectives for future operations, including the plans to introduce new pricing and incentives for the future growing seasons, along with the assumption that these pricing changes and incentives would generate increase sales.  As I have explained, this remains true "regardless of whether the speaker knows the statement is false."  <u>Panera Bread Co.</u>, 697 F. Supp. 2d at 1089.

These forward-looking statements were also accompanied by meaningful

cautionary language for the reasons previously discussed.  In addition to the

specific, detailed risks set out in the public filings, press releases, and the written

materials accompanying investor conferences, defendants warned of these same

risks repeatedly.  For example, on October 7 Casale warned that the new launches

of Roundup Ready 2 Yield and SmartStax would come "with a cost" and might not

"immediately translate into share shifts," even predicting a drop in the seeds and

genomics growth rate.  At the November investor event, Grant further cautioned

that Monsanto was still "in an early introductory year" with these new seed traits,

"so relative to the overall business it's still quite small . . . ."  Begemann also

discussed the problems that some farmers were experiencing with the early launch

of Roundup Ready 2 Yield soybeans, including lower than expected yield results

and lack of seed volume and variety, acknowledging that these setbacks were not

"what we're hoping our farmers will experience."  Begemann attributed the "rough

year" experienced by farmers to weather conditions, which delayed seed purchases

and echoed Grant's statements that "the total volumes of SmartStax and Roundup

Ready 2 Yield are not huge."  Casale then told investors that "Roundup's not going

to contribute to the gross profit increase in the business as we progress towards

2012."  Because the identified risks were detailed and specific to Monsanto's

business and the changing conditions of the marketplace, defendants' forward-

looking statements were accompanied by meaningful cautionary language and are not actionable under the safe harbor provision of the Act.

In addition, plaintiff cannot demonstrate the falsity of these statements. Plaintiff challenges defendants' predictions about Roundup as false and misleading because they did not disclose the glyphosate sales incentives or that the announced September price cut had not increased demand.  As for the price cut, Casale specifically warned investors during the October 7 conference call that the growing season was "just getting going," so it was too early to determine the price cut's effect on sales.  Moreover, there is no evidence that these statements were false or misleading as Monsanto was not necessarily unable to reach its predicted gross profit guidance for 2012 based upon Roundup sales in the fourth quarter of 2009. The same analysis applies to Monsanto's Form 10-K prediction that Roundup would "continue to generate a strong source of cash and gross profit."  As I have previously explained, this statement (and others regarding future projections and statements about Roundup) is not necessarily inconsistent with alleged decreasing sales, and there is no indication that even a material decline in sales necessarily rendered Monsanto unable to achieve its projected earnings.  See Cerner, 425 F.3d at 1084.  The allegations regarding the glyphosate sales incentives are the same as those discussed in the last quarter, and they fail for the same reasons discussed

above.  Under these circumstances, these allegations cannot survive the Act's

falsity standard.

Plaintiff also challenges defendants' predictions relating to seeds and traits

as false because Monsanto failed to disclose problems with the launch of Roundup

Ready 2 Yield and SmartStax.   These allegations of falsity are not sufficient

because plaintiff has not specifically alleged what the "expectations" were for the

launch of these new products, so it is impossible to determine whether, as plaintiff

alleges, sales were "materially below expectations."  The opinions of CI 9 and CI

10 (two independent seed distributors who did not even work for Monsanto) are

insufficient to demonstrate that Monsanto's predictions about its seeds and traits

business were false and misleading.  Just because these two distributors may have

believed that farmers were hesitant to purchase the new seeds is not necessarily

inconsistent with Monsanto's predictions about its seeds and traits business, and

there is no indication that these alleged difficulties with Roundup Ready 2 Yield

and SmartStax necessarily rendered Monsanto unable to achieve its projected

earnings.  Plaintiff's reliance on the OTR Global report is equally misplaced.  This

single study (which Monsanto disputed as flawed) does not demonstrate that

Monsanto's predictions about its seeds and traits business, including the

underlying assumptions of expected yield results, were false and misleading.  This

is especially true given defendants' repeated statements that the launch of these products was limited, included only limited varieties and volume, and did not provide expected yield results for some farmers.

Monsanto's December 8 statement that SmartStax and Roundup Ready 2 Yield products delivered "great" or "exceptional" performance and "me[t] our requirements" is not, as plaintiff claims, an actionable statement of present, verifiable fact. Instead, this vague statement of corporate optimism constitutes inactionable puffery "that no reasonable investor would rely upon." See Hutchinson, 536 F.3d at 960 (internal quotation marks and citation omitted). The same is true of defendants' statements about seeds and traits being "positive drivers" and "game-changing technologies," having "unprecedented levels" of grower profitability, "compelling returns," and a "strong level of support from our customers," as well as the previously discussed statements about "being on track" or "committed" to reaching the predicted goals of gross profitability and such similar "soft, puffing statements." Id. My review of the record reveals no actionable statements for the fourth quarter of fiscal year 2009.

**E.     First Quarter Fiscal Year 2010**

<u>Defendants' Statements</u>

In a January 6, 2010 press release,[48] Monsanto announced first-quarter fiscal 2010 results and confirmed ongoing EPS guidance of $3.10-$3.30.  The press release affirms that Monsanto is "on track to meet its 2010 financial commitments" and includes the following statement from Grant:

> Our first quarter is a small but important quarter as it sets the foundation for the year ahead, which we see as a critical year in propelling us to reach our 2011 and 2012 commitments . . . We've delivered on our targets for the quarter and this year we are confident that we will achieve the milestones necessary to reach our financial commitment to our shareowners.  Today we also take a closer look at our R&D pipeline and bring 11 new technologies that will deliver real value to farmers closer to the field.  With our selling season well underway and the demand we see for Genuity SmartStax corn and Genuity Roundup Ready 2 Yield soybeans, we believe it will only get better from here.  These winning products are the platform for many of the technologies in the early phases in our pipeline, and we're closer to demonstrating what those new technologies can do on the farm.

In the section entitled "Results of Operations," the press release states that net sales decreased $952 million, or 36 percent, in the three-month comparison "primarily as a result of decreased sales of glyphosate-based herbicide, primarily in Brazil and Europe."  Monsanto also reported that "gross profit percentage for the total

---

[48]The press release contains a section entitled Cautionary Statements Regarding Forward-Looking Information, which contains the standard Monsanto cautionary language about forward-looking statements.

company decreased 15 percentage points to 44 percent in the first quarter, largely

driven by pricing adjustments for Roundup and other glyphosate-based

herbicides."

In Agricultural Productivity, Monsanto's sales in the first quarter declined

57 percent or $884 million compared with the same period in 2009, due to "the

global supply-demand imbalance."  The press release states that to address this

problem Monsanto "continues to execute on its plan by resetting branded prices to

bring premiums more in line with historical norms, increasing overall volumes and

optimizing its low-cost production advantage."  Finally, Monsanto reported that

the Seeds and Genomics segment decreased six percent or $68 million compared to

the first quarter of 2009.  The press release announces the "launch of Genuity

SmartStax corn, which is expected to be on more than 4 million acres.  Given the

early orders, the early-adopter uptake for Genuity SmartStax has been good and the

company is on pace to meet the more than 4 million-acre target."  However,

Monsanto reported that soybean gross profit was down four percent "due to a

timing effect."  The release states that "[d]elays in harvesting last year's soybean

crop have put the company's seed shipments slightly behind," but Monsanto still

believed that its "sales to date" were "on pace" to meet the increased acres target of

eight to million acres.

In a company earnings conference call held the same day,[49] Casale stressed that Monsanto's "guidance is a commitment, not an aspiration . . . I feel confident confirming our full year EPS and cash flow targets today."  Casale discussed the progress Monsanto was making in the "plan to generate $650 million to $750 million in Roundup gross profit this year, on the way to a sustainable $1 billion in gross profit by 2012."  He stated: "We're executing on our 2010 objectives to reduce Roundup prices to bring premiums more in line with historical norms, increase overall volumes and optimize our low cost production advantage."  Casale reported that the U.S. growing season "is shaping up as we expected" with a good response to price reduction.  Although he noted that "the clearing of generic inventory is still under way, keeping farm gate generic prices depressed," Casale believed that "our price moving incentives put us where we need to be at this point in the season."  With respect to seeds and traits, Casale stated:

---

[49]As with all other calls, this conference call began with the following statement from a Monsanto executive:

> I need to remind you that this call will include statements concerning future
> events and financial results.  Because these statements are based on assumptions
> and factors that involve risk and uncertainty, the Company's actual performance
> and results may vary in a material way from those expressed or implied in any
> forward-looking statements.  A description of the factors that may cause such a
> variance is included in the Safe Harbor language contained in our recent 10-K and
> in today's press release.

The presentation also included written materials containing Monsanto's standard safe harbor language.

We remain on track for a $5.1 billion to $5.2 billion in absolute gross profit target for Seeds and Traits.  Thus, the value of our crop portfolio approach allows upsides and down sides to offset each other.  That brings me to the last element of our Seeds and Traits outlook, the order book.  Given our expectation that 2010 sets the tone for SmartStax and Roundup Ready 2 Yield acceleration, the logical question becomes how are actual orders tracking in the order book for this year.  Hugh [Grant] and I personally reviewed the order book at calendar end, so I'll give you both the data and our read on how the order book translates into our operational milestones.

First, by December 31, a good portion of the seed is on order, but not all.  In a usual year, the selling season wraps up by mid-to late February, and that's still likely to be the case even in a late harvest.  The significant portion of the selling season is still ahead, this represents an early look.  Second, despite the early look, prepayment tracking year-over-year cash received from independent dealers are approximately 20% above the prepayment levels at the end of December last year.  Cash in hand provides the best barometer of pace and reliability of orders, and the fact that we are seeing better prepaids in a later season is a signal of good overall order patterns.

Third, the order pace bodes well for introductory volume of SmartStax and Roundup Ready 2 Yield.  At our November investor event, we increased our expectation for launch year SmartStax volume to more than 4 million acres as shown on slide eight.  More than half of our SmartStax target was spoken for before farmers had the benefit of knowing the specific hybrids available.  That's a function of late harvest, where hybrid qualification was later than usual, meaning we didn't have our lineup of commercial hybrids into the hands of our sales force until early December,  But given those orders, early adopter uptake in the first year has been good and that gives us confidence we're on pace to reach our 4 million-acre target.

Likewise, in Roundup Ready 2 Yield, our accelerated eight to 10 million-acre ramp is on pace.  There's no denying that we had to cut through the chatter and sell the performance of our class of 2010 varieties, but like SmartStax, placement of our early adopter volume is

happening and we're on pace to deliver on our 2010 commitment.  For both Roundup Ready 2 Yield and SmartStax, our realized selling prices continue to be in the expected ranges we previously discussed.

As I view fiscal 2010, our task is execution.  At the start of the fiscal year, we're executing against the plan on the critical areas that influence the quarter, particularly our Roundup strategy and the corn trait opportunity.  And perhaps more importantly, the early signs are in place that give us confidence that we're meeting the milestones that drive our Seeds and Traits opportunity in the US.

In response to a question from a participant, Grant stated that the 4 million acre projected target for SmartStax is "being realized.  It's a pretty small base this year, but it's being realized."  Casale also affirmed that "the demand is strong and bear in mind, at 4 million acres, we're targeting the early adopters of the technology, so the price of orders that we see on SmartStax is very consistent . . . with what our expectations are, so we feel very good about the 4 million acres for the year." When asked by another participant about expected selling prices for soy and corn, Grant responded that "[i]t's early" but "so far, so good," although he stressed that "competitive pricing pressure" is usually seen later in the planting season.

Two days later, Monsanto filed its 10-Q for the first quarter ended November 30, 2009.  The Outlook Section states as follows:

We have achieved an industry-leading position in the areas in which we compete in both of our business segments.  However, the outlook for each part of our business is quite different.  In the Seeds and Genomics segment, our seeds and traits business is expected to expand.  In the Agricultural Productivity segment, our glyphosate

business has grown through increases in our average net selling prices in 2008 and 2009, however prices have declined in fiscal year 2010 and are expected to remain lower than in 2008 and 2009.  In 2009, our glyphosate volumes declined due to share loss resulting from declining competitive prices and increasing competitive supply, as well as from the effects of the drought in South America.  Our selective chemistry business is expected to decline.  As a result, we are working to rebuild a competitive position in our chemistry business, while we strive to expand our business in seeds and traits via our investment in new products.

We believe our company is positioned to deliver value added products to growers enabling us to double 2007 gross profit by 2012.  In the short term, we expect volatility in the our Roundup business as it moves to a sustainable level of earnings. . . In 2010, we also expect to see increased gross profit as our higher-margin seeds and traits business continues to grow.

. . .

Our capabilities in plant breeding and biotechnology research are generating a rich and balanced product pipeline that we expect will drive long-term growth.  We plan to continue to invest in the areas of seeds, genomics and biotechnology arrangements that have the potential to increase the efficiency and effectiveness of our R&D efforts.  We believe that our seeds and traits businesses will have significant near-term growth opportunities through a combination of improved breeding and continued growth of stacked and second-generation biotech traits.

. . .

We believe our Roundup herbicide gross profit peaked in 2008 and will decline in 2010 in light of our previously announced U.S. price reduction and a global oversupply or low priced generic material.  However, we believe the business will continue to generate a strong source of cash and gross profit.  Prices of generic formulations of glyphosate herbicides increased during fiscal year 2008, but against a background of increased global supply and softening raw material prices, generic prices are now at or near historical lows in many of our

> key markets.  We have experienced fluctuating demand in recent
> years, and we are increasing production capacity at our Luling,
> Louisiana, plant to meet the anticipated future demand for Roundup.
> We will continue to actively manage our inventory and other costs.

The first section of the Form 10-Q contains the following section entitled "Caution

Regarding Forward-Looking Statements:"

> In the interests of our investors, and in accordance with the "safe
> harbor" provisions of the Private Securities Litigation Reform Act of
> 1995, this section of our report explains some of the important reasons
> that actual results may be materially different from those that we
> anticipate . . .[W]e share our expectations for our company's future
> performance . . . Since these statements are based on factors that
> involve risks and uncertainties, our company's actual performance and
> results may differ materially from those described or implied by such
> forward-looking statements.  Factors that could cause or contribute to
> such differences include, among others: continued competition in
> seeds, traits and agricultural chemicals; the company's exposure to
> various contingencies, including those relating to intellectual property
> protection, regulatory compliance and the speed with which approvals
> are received, and public acceptance of biotechnology products; the
> success of the company's research and development activities; . . .
> fluctuations in commodity prices; . . . the accuracy of the company's
> estimates related to distribution inventory levels; the company's
> ability to fund its short-term financing needs and to obtain payment
> for the products that it sells; the effect of weather conditions, natural
> disasters and accidents on the agriculture business or the company's
> facilities; and other risks and factors described or referenced in [the
> Risk Factors section below] and . . . . our Report on Form 10-K for the
> fiscal year ended Aug. 31, 2009

The Risk Factors section of the 10-Q refers to the risk factors disclosed in the Form

10-K for the fiscal year ended August 31, 2009 and states that "there have been no

material changes from the risk factors previously disclosed . . . ."

On January 13, 2010, Monsanto hosted an R & D Pipeline Review telephone

conference.  Casale began his presentation with a reminder that "we will be making

some forward-looking statements today."[50]  He then stated:

> [W]e had our Q1 earnings call last week.  And basically, what we did
> is we reaffirmed the guidance we'd given across key metrics basically
> back in November at our biannual investor day.  We reconfirmed that
> our anticipated EPS is in the $3.10 to $3.30 range for the full year.
> Free cash we believe will be in the $900 million to $1 billion range for
> the year.  Seeds and Genomics business anticipate will grow across $5
> billion in GP for the time, basically 13% to 15% CAGR off of our
> previous year results.
>
> Roundup Ready 2 Yield and SmartStax are the current focus for our
> business on our launch year this year.  We provided some color on our
> order book last week.  And basically, the order uptake or pace on both
> products is consistent with what our expectations were in order to
> achieve our objectives for the full year.  So, we feel confident in the
> guidance we've provided.
>
> Roundup: we did a reset on the business as you're all aware.  We
> anticipate gross profit will be in the $650 million to $750 million
> range this year.  The changes that we've made in terms of business
> model, getting the brand reestablished, setting more nominal
> premiums relative to generics – we see volume uptake being good.  So
> again, we believe that we're on plan to deliver against our $650
> million to $750 million for the year, on our path to $1 billion in gross
> profit by 2012.

On February 10, 2010, Begemann told the participants at the Goldman Sachs

Agricultural Biotech Forum that Monsanto "was on path for our 2012, with 2010

---

[50]The presentation was accompanied by materials including Monsanto's standard safe
harbor language regarding forward-looking statements.

being that year of execution, albeit 2010 is the challenging year that we said 2010

was going to be . . . ."[51]

On February 25, 2010, Monsanto made a presentation at the Morgan Stanley

Global Basic Materials conference.  During the conference Casale stated:

> I should talk a little bit about how do we see acres this year on
> Roundup Ready 2 Yield?  A few weeks ago we said that – and I'll talk
> about SmartStax as well, we saw about 8 million acres of Roundup
> Ready 2 Yield and about 4 million acres of SmartStax.  As I stand
> here today I think both of those numbers would be in the top end of
> the range.  And if I were kind of calibrating meaningfully what is that
> range, I'd take both of those numbers and I'd take 20% off of those
> numbers and that's the range that I think we're probably going to land
> in.

> So a couple of things about that.  What are we seeing?  What we're
> seeing is we're seeing the same number of farmers trying the product
> this year which is good because they've got to try to gain experience
> to gain the intensification that we have in our plan.  But we had
> surplus production because we had a really good production year.
> They're buying what they believe is meaningful for trial, but they're
> not doubling down and trying more because we've got it available.

> So I feel good about where we're at from both a customer trial
> standpoint and if you took the low end of those ranges both on
> SmartStax corn and Roundup Ready 2 Yield, even at the low end of
> those ranges we have more than adequate trajectory on both of those
> to achieve our 2012 milestones as well as in both products achieving
> 16 million to 18 million acres in each of those in 2011.

However, Casale warned that Monsanto's guidance for 2010 "includes some

---

[51]Begemann's presentation was accompanied by materials containing Monsanto's
standard safe harbor language.

headwinds," such as "launch costs associated with the establishment of both
Roundup Ready 2 Yield and SmartStax" and "about $100 million to $150 million
of incremental price concessions or trade incentives that we have in our Roundup
business to reestablish the Roundup brand within our distribution channels."
Casale explained that the launch of the two products was "more about getting the
product positioned to have the better trajectory to grow [in 2012] than it was the
incremental gross profit contribution in 2010."  As always, the materials provided
by Monsanto during this conference included the standard safe harbor language.

          Plaintiff's Allegations That These Statements Were False and/or Misleading

          Plaintiff claims that Monsanto's statements during this time period about
Roundup Ready 2 Yield and SmartStax were false and misleading because
"demand for Monsanto's products was in free-fall and the Company's customers
were in full-blown rebellion over high seed prices."  Plaintiff claims it was
knowledge about problems with Roundup Ready 2 Yield and SmartStax that
prompted Grant and "his team" to "personally embark[] on a 'listening tour' in
which he visited with 1,200 farmers and heard complaints about Monsanto's
prices" in the first quarter of 2010.  Plaintiff alleges that Monsanto continued to
experience material problems with its SmartStax product during this time period as
well.  Plaintiff alleges that Monsanto's statements during this time period were

false and misleading because "[a]ccording to CI 5, there were material defects with

certain of Monsanto's new corn seeds." As evidence of this allegation, plaintiff

claims that "CI 5 sold, among other products, two SmartStax hybrids which had

been tentatively approved by Monsanto Research & Development (R&D)."

However, plaintiff alleges that CI 5 was told by R&D that these two hybrids did

not "make it through the last (testing) hoop" about midway through the growing

season, and that Monsanto ceased its sales of these two seeds. "According to CI 5,

another seed replaced the defective seeds. Further, farmers who had already paid

for these two respective hybrids experienced poor yields in 2010 and Monsanto

had to provide financial incentives to farmers who experienced poor yields."

Plaintiff also repeats its allegations that defendants' statements about Roundup

Ready 2 Yield were false and misleading because defendants failed to disclose that,

for the 2010 growing season, sales of Monsanto's Roundup Ready 2 Yield

soybeans were "materially below expectations" because the seeds were too

expensive, did not "materially improve crop yields," and were sold in limited

varieties.

   Plaintiff also alleges that defendants' statements were false and misleading

because Monsanto failed to disclose that the price decrease of Roundup had not

increased demand, which "severely, negatively" impacted Monsanto's gross profit,

and that Monsanto's new Roundup Ready 2 Yield soybeans were "materially below expectations" because the new seeds were too expensive, offered in limited varieties, and did not materially improve crop yields, which negatively impacted the sales of new Roundup Ready 2 Yield seeds.  Plaintiff claims that, "for these reasons, defendants knew that Monsanto could not double 2007 gross profits by 2012 or it was at least severely reckless for defendants to make this representation."

Analysis

Once again, most of defendants' statements are forward-looking and protected by the safe harbor provision of the Act for the same reasons discussed above.  These statements include: predictions of gross profit (including predictions of doubling gross profit and being  "confident," "committed," and "on track" to do so), as well as gross profit for Roundup and the seeds and traits business; predicted selling prices for Roundup; predicted sales volume and market penetration for Roundup Ready 2 Yield soybeans and SmartStax corn, along with the underlying assumptions that these predictions would be reached because of expected yield increases and price premiums; predicted guidance numbers; and statements of plans and objectives for future operations, including the plans to introduce new pricing and incentives for the future growing seasons, along with the assumption

that these pricing changes and incentives would generate increase sales.  As I have explained, the safe harbor provision protections exist "regardless of whether the speaker knows the statement is false."  Panera Bread Co., 697 F. Supp. 2d at 1089.

These forward-looking statements were accompanied by meaningful cautionary language for the reasons previously discussed.  In addition to the specific, detailed risks set out in detail above and contained in public filings, press releases, and written materials accompanying investor conferences,[52] defendants again warned of these same risks repeatedly.  During the January 6, 2010 conference call, Casale reported that "the clearing of generic inventory [of glyphosate] is still under way, keeping farm gate generic prices depressed" so it was still too early to determine the effect of price reductions and incentives.  As for the predictions about Roundup Ready 2 Yield and SmartStax, defendants made clear that they were talking about "introductory volumes," a "small base" for the projected volume targets, and that they were relying on "early adapters of the technology" to meet these goals.  Casale warned investors on February 25 that Monsanto's 2010 guidance "includes some headwinds," such as launch costs associated with Roundup Ready 2 Yield and SmartStax and Roundup incentives.

---

[52]For example, the press release disclosed decreased net sales resulting from the global supply-demand imbalance in glyphosate and decreased soy bean sales due to a delay in seed shipments, and the Form 10-Q reported declining Roundup sales and continued market volatility due to competitive pricing, fluctuating demand, oversupply, and weather conditions.

He also stated that previously announced acreage targets for Roundup Ready 2
Yield and SmartStax would be at the "top end of the range" (and likely 20% lower)
because the launch of these products was really "more about getting the product
positioned" to grow than about "gross profit contribution in 2010."  Because the
identified risks were detailed and specific to Monsanto's business and the changing
conditions of the marketplace, defendants' forward-looking statements were
accompanied by meaningful cautionary language and are not actionable under the
safe harbor provision of the Act.

    Plaintiff also cannot demonstrate the falsity of these statements.  Plaintiff
challenges defendants' predictions about Roundup as false and misleading because
they did not disclose that the announced September price cut had not increased
demand.  This argument fails because Casale acknowledged on the January 6
conference call that the "clearing of generic inventory" was keeping prices
depressed, and the Form 10-Q disclosed decreasing Roundup net sales and gross
profit, despite price cuts, due to competitive pricing and supply issues.   Moreover,
there is no evidence that these statements were false or misleading as Monsanto
was not necessarily unable to reach its predicted gross profit guidance for 2012
based upon Roundup sales in the first quarter of 2010.  The same analysis applies
to Monsanto's continued Form 10-Q prediction that Roundup would "continue to

generate a strong source of cash and gross profit."  As I have previously explained, this statement (and others regarding future projections and statements about Roundup) is not necessarily inconsistent with alleged decreasing sales, and there is no indication that even a material decline in sales necessarily rendered Monsanto unable to achieve its projected earnings.  The allegations regarding the glyphosate sales incentives are the same as those discussed in the last two quarters, and they fail for the same reasons discussed above.  Under these circumstances, these allegations cannot survive the PSLRA's falsity standard.

Plaintiff also alleges that defendants' predictions relating to the expected size of the launches of Roundup Ready 2 Yield and SmartStax were misleading. Yet there is no evidence that defendants made false or misleading predictions about these two products.  On February 25, Casale stated that the predicted forecasts of 8 to 10 million acres of Roundup Ready 2 Yield and 4 million acres of SmartStax represented the "top end" of the range and that both launches would probably be about 20 % smaller.   Defendants made clear that they were talking about "introductory volumes," a "small base" for the projected volume targets, and that they were relying on "early adapters of the technology" to meet these goals. Casale said "[i]t's early" but "so far, so good," although he stressed that "competitive pricing pressure" is usually seen later in the planting season.

Plaintiff continues to challenge defendants' predictions relating to seeds and traits as false because Monsanto failed to disclose problems with the launch of Roundup Ready 2 Yield and SmartStax.  As with the similar allegations made in connection with the prior quarter, these allegations of falsity do not survive the Act.  Again, plaintiff has not specifically alleged what the "expectations" were for the launch of these new products, so it is impossible to determine whether, as plaintiff alleges, sales were "materially below expectations."  To support its allegation, plaintiff relies on a confidential informant who claims that he was advised that two hybrid varieties of SmartStax had "failed final testing," which required Monsanto to replace the defective seeds and "provide financial incentives to farmers who experienced poor yields."  This allegation falls short of demonstrating falsity because it fails to explain the portion of Monsanto's overall SmartStax sales affected by the alleged defect, or the effect, if any, the alleged defect had on Monsanto's ability to meet its SmartStax acreage forecast.  The alleged failure of two hybrid varieties of corn seeds is not necessarily inconsistent with Monsanto's predictions about its seeds and traits business, and there is no indication that these alleged difficulties with Roundup Ready 2 Yield and SmartStax necessarily rendered Monsanto unable to achieve its projected earnings or otherwise made defendants' statements false or misleading.  This is especially

true given defendants' repeated statements that the launch of these products was limited, still in the early stages, and included only limited varieties and volume.

Plaintiff challenges the statement in Monsanto's January 6, 2010 press release that "delays in harvesting last year's soybean crop have put the company's seed shipments slightly behind, with this volume expected to shift into the second quarter" as one of verifiable fact, not forward-looking.  Yet plaintiff fails to allege facts that showing that this statement was false or misleading.  Plaintiff has not alleged that there was no delay in harvesting soybeans in late 2009 after the "wettest fall in 120 years," or that this delay did not affect soybean sales, so it is not actionable under the Act.  Plaintiff also makes much of Casale's statement that "Hugh [Grant] and I personally reviewed the order book at calendar end," but again has not alleged that Casale or Grant did not actually do so.  Without any allegation or evidence of falsity, this statement is not actionable under the Act.

Statements that SmartStax and Roundup Ready 2 Yield are "winning products" are not actionable statements of present, verifiable fact.  Instead, they are inactionable puffery.  The same is true of the previously discussed statements about "being on track" or "committed" to reaching the predicted goals of sales and gross profitability and such similar "soft, puffing statements."  Id.  My review of the record reveals no actionable statements for the first quarter of fiscal year 2010.

**F.     Second Quarter Fiscal Year 2010**

<u>Defendants' Statements</u>

On April 7, 2010, Monsanto announced its second-quarter results in a press release.[53]  Monsanto confirmed full-year 2010 ongoing EPS guidance in the range of $3.10 to $3.30, with full-year 2010 EPS on an as-reported basis in the low end of the range of $2.85 to $3.11.  For the first time, Monsanto announced that "its goal of doubling 2007 gross profit by 2012 is unlikely."  Citing "key trends that deviated from the core planning assumptions for Roundup," including "the continued presence of generic inventory and competitive pricing strategies," Monsanto also lowered its Roundup/glyphosate gross profit forecast to "plus-or-minus $600 million for the year."  Grant issued the following statement:

> Over the course of a five-year operational plan, the landscape can change.  While there may be options to make an accelerated push for 2012, it's clear to me that achieving that objective would involve making short-term choices that are not in the long-range interests of the business.  Still, nothing has changed in my fundamental view of the business.  We have the best products, we have a commercial and technology lead and we have the experience to apply the lessons of 2010.  Given that, I am confident that we're a growth company going forward.

In an earnings conference call later that day, Casale told participants that U. S.

---

[53]The release contains the standard cautionary language regarding forward-looking information.

Roundup prices remained "slightly below" the previously projected $10-$12 per gallon range "as competitive generic inventory has moved out of the system slower than we would have anticipated, depressing farm gate prices below what we [would] expect."  He also warned that "we're starting to see early evidence of competitors using [generic glyphosate] as a los[s] leader to sell other chemical products in the[ir] portfolios creating margin compression in the channel that threatens to keep farm gate prices from fully rebounding with seasonal refills." Casale predicted 3 million acres of SmartStax to be planted and about 6 million acres of Roundup Ready 2 Yield.

Grant also spoke, telling participants that "we recognize it's unlikely we will reach our goal of doubling our 2007 gross profit by 2012," and "[w]hile there may be options to make an accelerated push for 2012, it's clear that achieving that objective could involve making sharp choices that to me are not in a long range interest of this business."  He then stated:

> Firstly, we're committed to Roundup.  We've already done the massive reengineering that scaled the business for more than a billion dollars that came off the gross profit peak, and even with the potential for structural changes in the industry, we still believe that this can be a sustainable cash generating business, but perhaps more importantly, Roundup's more than just a casual compliment to our seed business. It's a fundamental pillar that supports our expanding Roundup ready trait franchise, so whatever we do, having a secure supply of Roundup is key to our future trait opportunities.  Our teams are working in ways that Roundup can be deployed more directly as part of our

comprehensive weed control system that helps sell the value of our Roundup ready trait products.  If you take a step back and you consider our treatment platform as an example, it's fundamentally a package of commodity ingredients, but it's delivered in a way that enhances the value of the seed that we sell, and this, I think, is a model for Roundup in the future, and an era where weed control systems and resistance Management strategies are relevant to the seed purchase decision of farmers, we see a real opportunity for Roundup taking a more prominent role in helping create a total quality package of value for our customers.

While answering questions from participants, Casale and Grant cautioned that the "competitive dynamics" within generic glyphosate "remain acute resulting in systemic price competition," which had "the potential to strain our full year Roundup performance and put pressure on our ability to meet our projected gross profit expectations," and that, if it persisted, Monsanto "might be looking at a lower level of [Roundup gross profit] . . . for the long term for the business." Grant also said that, in response to farmer feedback, Monsanto would be focusing more on volume, offering a "broader range of product[s]," and "faster, earlier trial by growers" because "when you get told the same thing often enough, it becomes pretty compelling."[54]  The materials accompanying the conference call included the

---

[54]Grant earlier stated that "the feedback that I have personally [had] from growers is if our price points were different, our adoption curves would be different."  Paragraph 116 of the second amended complaint conflates these two statements and is misleading.  Plaintiff's failure to include any exhibit supporting its second amended complaint, or even a citation to defendant's exhibits, has forced the Court to expend needless hours pouring through the record to determine the context and accuracy of every cited quotation.

- 107 -

standard safe-harbor language.

On April 8, 2010, Monsanto filed its Form 10-Q for the period ended

February 28, 2010.  The Outlook section states:

> In the Seeds and Genomics segment, our seeds and traits business is
> expected to expand.  In the Agricultural Productivity segment, our
> glyphosate business has grown through increases in our average net
> selling prices in 2008 and 2009, however prices have declined in
> fiscal year 2010 and are expected to remain lower than in 2008 and
> 2009.  In 2009, our glyphosate volumes declined due to share loss
> resulting from declining competitive prices and increasing competitive
> supply, as well as from the effect of the drought in South America.
> Our selective chemistry business is expected to decline.  As a result,
> we are working to rebuild a competitive position in our chemistry
> business, while we strive to expand our business in seeds and traits via
> our investment in new products.
>
> We believe that our company is positioned to deliver value added
> products to growers enabling us to grow our gross profit in the future.
> In the short term, we expect volatility in our Roundup business as it
> moves to a sustainable level of earnings.  We expect to see strong cash
> flow as well over the period, and we remain committed to returning
> value to shareowners through vehicles such as investments that
> expand the business, dividends and share repurchases.
>
> . . .
>
> We believe our Roundup herbicide gross profit peaked in 2008 and
> will decline in 2010 in light of our previously announced U.S. price
> reduction and a global supply of low priced generic material.
> However, we believe the business will continue to generate a strong
> source of cash and gross profit.  Prices of generic formulations of
> glyphosate herbicides increased during fiscal year 2008, but against a
> backdrop of increased global supply and softening raw material
> prices, generic prices are now at or near historical lows in many of our
> key markets.  However, raw material prices have started to increase
> again.  We have experienced fluctuating demand in recent years, and

we recently successfully started-up new production capacity at our
Luling, Louisiana, plant to meet the anticipated future demand for
Roundup.  We will continue to actively manage our inventory and
other costs.

The first section of the Form 10-Q contains the following section entitled "Caution

Regarding Forward-Looking Statements:"

In the interests of our investors, and in accordance with the "safe
harbor" provisions of the Private Securities Litigation Reform Act of
1995, this section of our report explains some of the important reasons
that actual results may be materially different from those that we
anticipate . . .[W]e share our expectations for our company's future
performance . . . Since these statements are based on factors that
involve risks and uncertainties, our company's actual performance and
results may differ materially from those described or implied by such
forward-looking statements.  Factors that could cause or contribute to
such differences include, among others: continued competition in
seeds, traits and agricultural chemicals; the company's exposure to
various contingencies, including those relating to intellectual property
protection, regulatory compliance and the speed with which approvals
are received, and public acceptance of biotechnology products; the
success of the company's research and development activities; . . .
fluctuations in commodity prices; . . . the accuracy of the company's
estimates related to distribution inventory levels; the company's
ability to fund its short-term financing needs and to obtain payment
for the products that it sells; the effect of weather conditions, natural
disasters and accidents on the agriculture business or the company's
facilities; and other risks and factors described or referenced in [the
Risk Factors section below] and . . . . our Report on Form 10-K for the
fiscal year ended Aug. 31, 2009

The Risk Factors section of the 10-Q refers to the risk factors disclosed in the Form

10-K for the fiscal year ended August 31, 2009 and states that "there have been no

material changes from the risk factors previously disclosed . . . ."

- 109 -

On May 27, 2010, the last day of the class period, Monsanto issued a press release announcing that it was "repositioning its Roundup business in the face of fundamental structural changes that have caused upheaval in the glyphosate industry."  These changes included "systemic margin compression in the distribution channel attributed to sustained oversupply of glyphosate," "the reality that Chinese glyphosate overcapacity is profoundly overbuilt," and "an abbreviated burn-down season in the United States that limited the opportunity for sales in the third quarter."  Monsanto stated that to address these changes it was lowering prices on volume for the 2011 season, accelerating payment on certain distributor and retailer incentives, simplifying its product offerings, and moving to a "single-brand strategy" in key markets.   Monsanto reported that it now expected fiscal-year 2010 earnings per share to be in the range of $2.40 to $2.60 on an ongoing basis and $2.15 to $2.41 on an as-reported basis, with the ongoing gross profit contribution of Roundup to be in the range of $50-$250 million for fiscal 2010 and $250 million to $300 million per year thereafter.[55]

In a conference call later that day, Grant justified the "dramatic reposition[ing] [of] our Roundup business" as follows:

This significant change in our approach addresses nearly two years of

---

[55]The press release includes Monsanto's standard safe-harbor language.

> volatility and uncertainty by placing Roundup and weed management
> squarely where it needs to be, in strategic support of our core Seeds &
> Traits franchise. The scope is dramatic, and the net effect is real. But
> the certainty and clarity that we achieve by doing this now and doing
> this so aggressively will be what matters to our business long-term.
> I'd venture that some may have expected tweaks in the Roundup
> business, given the early US indicators, but knowing what we know
> now, doing this halfway would only prolong the problem.

Grant explained that Monsanto had been tracking "adverse developments"

indicating that the glyphosate industry was on the verge of a structural change, but

that those developments actually accelerated in the early US season. The adverse

developments included the fact that glyphosate margins were at all-time lows, the

"chronically oversupplied" glyphosate market, the fact that "China is profoundly

overbuilt," and the need for "someone to step in and lead the industry to a simple

weed management approach, given the evolution of weed resistance."  Grant

predicted that Monsanto's new strategy would "free Monsanto to grow to its core

fundamentals . . . ."  Plaintiff's second amended complaint alleges that in June of

2010, Grant told investors that Monsanto had "left the chemical space" and

"removed the anticipation of additional growth in the Roundup business."[56]

Plaintiff's Allegations That These Statements Were False and/or Misleading

Plaintiff alleges that defendants' profit and sales predictions were false and

---

[56]Monsanto's Form 10-K filed on October 27, 2010 reported that Roundup contributed $142 million to gross profit.

misleading because they knew of the "materially deteriorating conditions" of Monsanto's Roundup business.  Plaintiff also claims that defendants' statements about Roundup continuing to be a "strong" or "sustainable" source of cash and gross profit were false and misleading because previous price decreases had not increased demand for Roundup.

Analysis

As with the previous quarters, defendants' forward-looking statements are protected by the safe harbor provision of the Act.  These include statements predicting gross profit and gross profit for Roundup and the seeds and traits business in 2010 and beyond, as well as predicted guidance numbers and statements of plans and objectives for future operations, including the plans to introduce new pricing and sales strategies for Roundup (including lowering prices on volume for the 2011 season, accelerating payment on certain distributor and retailer incentives, simplifying its product offerings, and moving to a "single-brand strategy" in key markets), along with the assumption that these changes would generate increase sales.  As I have explained, this protection remains "regardless of whether the speaker knows the statement is false."  Panera Bread Co., 697 F. Supp. 2d at 1089.

These forward-looking statements were also accompanied by meaningful

cautionary language for the reasons previously discussed.  In addition to the

specific, detailed risks set out in detail above, defendants cautioned investors of

factors that might result in even the lowered Roundup forecasts not being met.  For

example, the April 7 press release reported the "continued presence of generic

inventory" and Monsanto's need to adopt "competitive pricing strategies."  Later

that day, Casale told investors that U.S. Roundup prices remained "slightly below"

the previously projected range as generic glyphosate depressed prices below what

was expected.  He also warned that competitors were using glyphosate "as a loss

leader to sell other chemical products," while Grant reiterated that competition

from generic glyphosate "put pressure on our ability to meet our projected gross

profit expectation" and could result in a lower level of Roundup gross profit "long

term."  Because the identified risks were detailed and specific to Monsanto's

business and the changing conditions of the marketplace, defendants' forward-

looking statements were accompanied by meaningful cautionary language and are

not actionable under the safe harbor provision of the Act.

Monsanto's future projections and statements that Roundup would continue

to generate a "sustainable" or "strong" source of cash and gross profit are not false

and misleading because, as explained above, they are not necessarily inconsistent

with alleged decreasing sales.  They also constitute inactionable puffery for the

same reasons previously discussed.  My review of the record reveals no actionable

statements for second quarter of fiscal year 2010.[57]

## Discussion-Scienter

Even if plaintiff had alleged an actionable statement under the Act, it still

failed to adequately plead scienter under the PSLRA's special heightened pleading

standard.  "The inquiry is whether all of the facts alleged, taken collectively, give

rise to a strong inference of scienter . . . ."  Minneapolis Firefighters' Relief Assoc.

v. MEMC Electronic Materials, Inc., 641 F.3d 1023, 1029 (8th Cir. 2011) (quoting

---

[57]Defendants also move for dismissal under the "bespeaks caution doctrine," which
provides as follows:

> When an offering document's forecasts, opinions or projections are accompanied
> by meaningful cautionary statements, the forward-looking statements will not
> form the basis for a securities fraud claim if those statements did not affect the
> 'total mix' of information the document provided investors.  In other words,
> cautionary language, if sufficient, renders the alleged omissions or
> misrepresentations immaterial as a matter of law.

> The cautionary language must relate directly to that by which the plaintiffs claim
> to have been misled.

Parnes v. Gateway 2000, Inc., 122 F.3d 539, 548 (8th Cir. 1997) (internal quotation marks and
citations omitted).  "A dismissal of a securities fraud complaint under Rule 12(b)(6) should be
granted under the bespeaks caution doctrine only where the documents containing defendants'
challenged statements include enough cautionary language or risk disclosure that reasonable
minds could not disagree that the challenged statements were not misleading."  Id.  As the Court
found in its discussion of the safe harbor provision, defendants did issue meaningful cautionary
statements identifying precisely those factors that ultimately led to Monsanto lowering its
earning projections, and its failure to disclose did nothing to alter the "total mix" of information
available to the public for the same reasons discussed above.  "Because a reasonable investor
would not have ignored such warnings, these alleged representations are immaterial as a matter
of law" and must also be dismissed under the bespeaks caution doctrine.  Id. at 549.

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322-23 (2007)).  As set

out more fully in the beginning of this opinion, to meet the required "strong

inference" of scienter "the inference must be more than merely plausible or

reasonable — it must be cogent and compelling, thus strong in light of other

explanations."  Tellabs, 551 U.S. at 323-24.

  Here, plaintiff does not allege that defendants had any motive, such as

insider trading, to make false or misleading statements.  Instead, plaintiff alleges

that defendants "knew or were severely reckless in disregarding that the public

documents and statements issued or disseminated in the name of Monsanto were

materially false and misleading."  "Proof of severe reckless may establish the

requisite scienter."  Horizon Asset Management Inc. v. H & R Block, Inc., 580

F.3d 755, 766 (8th Cir. 2009).  "To demonstrate severe recklessness, a plaintiff

must allege highly unreasonable omissions or misrepresentations amounting to an

extreme departure from the standards of ordinary care, and that present a danger of

misleading buyers or sellers which is either known to the defendant or is so

obvious that the defendant must have been aware of it."  Id. (internal quotation

marks and citation omitted).  "[W]ithout a showing of motive or opportunity other

allegations tending to show scienter would have to be particularly strong in order

to meet the Reform Act standard."  In re K-Tel Intern., Inc. Securities Litig., 300

- 115 -

F.3d 881, 894 (8th Cir. 2002).[58]

Here, plaintiff's generic allegations of "severe recklessness" are insufficient to allege scienter under the Reform Act.  The second amended complaint does not plead any individual defendant's state of mind.  Instead, it merely alleges "knowledge" as a group without any specific allegations about each defendant and each alleged misrepresentation, such as how and what each defendant allegedly knew that rendered the alleged misstatement actionable.  This is plainly insufficient as plaintiff "must . . . raise a strong inference of scienter for each defendant and with respect to each alleged misrepresentation."  H & R Block, 580 F.3d at 761.

Statements from confidential informants claiming that Monsanto knew of excess glyphosate inventory and was worried about sales and production of glyphosate do not create the inference of scienter that is as compelling as the more innocent, simpler inference that the defendants thought that Monsanto was responding appropriately to deteriorating market conditions and were perhaps slow to appreciate the effect that these conditions would have on Monsanto's bottom line.  Yet defendants warned investors repeatedly of these risks and continually revised their projections downward in an attempt to respond to these conditions.

---

[58]K-Tel is consistent with the Supreme Court's more recent decision in Tellabs and therefore remains useful in the Court's analysis of this issue.  See Elam v. Neidorff, 502 F. Supp. 2d 988, 993-94 (E.D. Mo. 2007); see also MEMC Electronic Materials, Inc., 641 F.3d at 1030 (applying K-Tel on issue of scienter).

The same is true for the confidential informants' claims regarding Roundup Ready 2 Yield and SmartStax.  The more compelling inference is that defendants were optimistic about the introduction of the new technologies, but as discussed above this optimism was continually tempered by warnings about the introductory nature of the products and the risks associated with bringing new products to market.[59] "[M]isguided optimism is not a cause of action, and does not support an inference of fraud."  In re Carter-Wallace, Inc. Securities Litig., 220 F.3d 36, 42 (2d Cir. 2000) (internal quotation marks and citation omitted).[60]

Nor do plaintiff's newly added allegations regarding Monsanto's earnings restatement raise a strong inference of scienter.  Plaintiff does not allege accounting fraud, and the Eighth Circuit has rejected the argument that accounting errors or restatements, in and of themselves, demonstrate scienter.  "Allegations that accounting errors were discovered months and years later do not give rise to a strong inference that the certifications were knowingly false when made."  In re Ceridian Corp. Securities Litig., 542 F.3d 240, 248 (8th Cir. 2008).  Plaintiff fails

---

[59]There is the added problem that this "evidence" comes from confidential informants. See MEMC Electronic Materials, Inc., 641 F.3d at 1030 ("It is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences.  Perhaps these confidential sources have axes to grind.  Perhaps they are lying.  Perhaps they don't even exist.") (quoting Higginbotham v. Baxter International, Inc., 495 F.3d 753, 757 (7th Cir. 2007)).

[60]The Eighth Circuit cited this case with approval in K-Tel, 300 F.3d at 890.

to plead any facts showing that defendants knew of or recklessly disregarded facts that established Monsanto's financial statements were false when issued.  "[A] showing in hindsight that the statements were false does not demonstrate fraudulent intent."  <u>Id.</u> (internal quotation marks and citation omitted).  Here, as in <u>Ceridian</u>, "[w]ithout something more, the opposing inference of nonfraudulent intent — that there were mistakes by accounting personnel undetected because of faulty accounting controls — is simply more compelling."  <u>Id.</u> at 246.  When all the allegations are taken together, plaintiff has not met the "strong inference" requirement.

## <u>Conclusion</u>

Because plaintiff does not sufficiently allege an actionable misrepresentation or omission or scienter, the second amended complaint must be dismissed.  Having concluded that plaintiff's § 10(b) claims fail to meet the pleading requirements of the PSLRA and are barred by the safe harbor provision and the bespeaks caution doctrine, plaintiff's claims against the individual defendants under § 20(a) cannot proceed as a matter of law and must likewise be dismissed.  <u>See</u> <u>Navarre</u>, 299 F.3d at 748 (finding that an actionable § 20(a) claim must be preceded by an actionable primary violation under § 10(b)).

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motion to dismiss [#81] is granted, and plaintiff's second amended complaint is dismissed with prejudice.

A separate Judgment in accordance with this Memorandum and Order is entered the same date.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 1st day of August, 2012.